Kevin T. Snider, State Bar No. 170988
Matthew B. McReynolds, State Bar No. 234797
Milton E. Matchak, State Bar No. 215739
PACIFIC JUSTICE INSTITUTE
P.O. Box 276600
Sacramento, CA 95827
Tel. (916) 857-6900
ksnider@pji.org
mmcreynolds@pji.org
mmatchak@pji.org

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

JERAMIAH COOPER, RONALD FREEMAN II, ADRIAN GILBERT, SILVERIO GONZALEZ, SERGII GRINCHENKO, LARON JOHNSON, JIM LASOVICH, RAYMOND LOCKETT, MICHAEL MANZANO, TERESA OWENS, ROSALIND PARKER, RYAN RIVERA, ALBERT ROTH, JIM SCULLION, SZU CHEN SUN, NICK TAYLOR, DAROLYN TURNER,

        Plaintiffs,

   v.

SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT,

        Defendant.

Case No: 3:22-cv-09193-WHA

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Date: March 14, 2024
Time: 8:00 a.m.
Courtroom: 12
Judge: Hon. William H. Alsup

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on March 14, 2024, at 8:00 a.m., before the Honorable William H. Alsup, Plaintiffs, Jeremiah Cooper, et al., will move, and hereby do move, for partial summary judgment on all claims against San Francisco Bay Area Rapid Transit District pursuant to FRCP Rule 56. The Cooper-Plaintiffs will seek to go to trial on damages.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................iii

INTRODUCTION AND SUMMARY OF THE ARGUMENT.................................1

STATEMENT OF FACTS .........................................................................2

STANDARD OF REVIEW.........................................................................6

ARGUMENT .......................................................................................7

I. BART's protocol violated the free exercise of the Plaintiffs' religion........................7

   A. BART's conduct was done under color of law ...........................................7

   B. BART's conduct interfered with the free exercise of religion ...............................7

      i. BART's process of review, which resulted in the denial of religious exemptions and accommodations, is subject to strict scrutiny because the process was not generally an applicable regulation ...................................7

         a. BART's process utilized individualized assessments and exemptions .......7

         b. BART allowed similar secular conduct of the unvaccinated public which it prohibited for unvaccinated employees ...........................................9

      ii. To satisfy strict scrutiny review BART must demonstrate a compelling state interest ................................................................10

         a. To satisfy the exacting standard of strict scrutiny, BART was obligated to narrowly tailor its requirements .................................................10

         b. Constitutional obligations require BART to use the least restrictive means available.................................................................12

      iii. The system of individualized review comprised an unconstitutional examination of religious beliefs under color of law ..............................15

II. The Cooper-Plaintiffs should prevail under Title VII ...................................19

   A. The Cooper-Plaintiffs have made a prima facie showing under Title VII..........19

Cooper-Plaintiffs' Motion for Partial Summary Judgment

B. BART's conduct is inconsistent with Title VII's "good faith effort" requirement...................................................................................20

    i. The standard for *undue hardship* is not imposition of a de minimis cost on the employer ............................................................22

III. BART's failure to accommodate employees violated FEHA ...................23

CONCLUSION.................................................................................24

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Gen. Dynamics Convair Aerospace Div.*,
   589 F.2d 397 (9th Cir. 1978) ..................................................................22

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..............................................................................6

*Ansonia Bd of Educ. v. Phillbrook*,
   479 U.S. 60 (1986) ................................................................................20

*Atkins v. City of Los Angeles*,
   8 Cal. App. 5th 696 (Cal. Ct. App. 2017) ..........................................24

*Bowen v. Roy*,
   476 U.S. 693 (1986) ..............................................................................8

*Brener v. Diagnostic Ctr. Hosp.*,
   671 F.2d 141 (5th Cir. 1982) ..............................................................20

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ..............................................................................18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ......................................................... 7, 9, 10, 12, 18

*Davila v. Gladden*,
   777 F.3d 1198 (11th Cir. 2015) ..........................................................17

*Doe v. San Diego U.S.D.*,
   19 F.4th 1073 (9th Cir. 2021) ........................................................11, 12

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
   575 U.S. 768 (2015) ..............................................................................21

*EEOC v. Autonation United States Corp.*,
   52 F. App'x. 327 (9th Cir. 2002) ....................................................19, 20

*EEOC v. Hacienda Hotel*,
   881 F.2d 1504 (9th Cir. 1989) ............................................................20

*EEOC v. Townley Eng. & Mfg. Co.*,
   859 F.2d 610 (9th Cir. 1988) ..............................................................20

*Employment Div., Dept. of Human Resources of Ore. v. Smith,*
    494 U.S. 872 (1990) ...........................................................................7, 8, 9

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021) ..................................................................... 8, 11, 18

*Gateway City Church v. Newsom,*
    141 S. Ct. 1460 (2021) ...............................................................................13

*Groff v. DeJoy, Postmaster General,*
    143 S. Ct. 2279 (2023) ........................................................................22, 23

*Heller v. EBB Auto Co.,*
    8 F.3d 1433 (9th Cir. 1993) .......................................................................20

*Livadas v. Bradshaw,*
    512 U.S. 107 (1994) .....................................................................................7

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ...............................................................................18

*McGinnis v. U.S. Postal Service,*
    512 F. Supp. 517 (1980) .............................................................................19

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020) ...................................................................... 10, 12, 13

*Sherbert v. Verner,*
    374 U.S. 398 (1963) .....................................................................................8

*South Bay United Pentecostal Church v. Newsom,*
    141 S. Ct. 716 (2021) ...........................................................................10, 13

*Stormans v. Weisman,*
    794 F.3d 1064 (9th Cir. 2015) ...................................................................11

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) .............................................................10, 11, 12, 13

*Thomas v. Rev. Bd. of Ind. Empl. Sec. Div.,*
    450 U.S. 707 (1981) ...............................................................................17, 18

*United States v. Ballard,*
    322 U.S. 78 (1944) ...................................................................18

## CONSTITUTION

U.S. Const., amend. I ........................................................... *passim*

## STATUTES, RULES, AND REGULATIONS

29 C.F.R. § 1605.2 .................................................................22

42 U.S.C. § 1983 ..............................................................7, 19

42 U.S.C. § 2000e et seq. (Title VII of the Civil Rights Act of 1964) .................... *passim*

42 U.S.C. § 2000e-2(a) .........................................................19

42 U.S.C. § 12111(10)(A) ...................................................22, 23

Cal. Gov. Code § 7920 et. seq. (California Public Records Act) ....................13

Cal. Gov. Code § 12900 et seq. (FEHA) .............................2, 3, 23, 24

Cal. Gov. Code § 12926(u) .....................................................23

Cal. Gov. Code § 12940(a) ......................................................19

Federal Rules of Civil Procedure, Rule 56..........................................6

## OTHER SOURCES

CDPH, *State Issues Recommendations to Local Health Departments and Providers to Accelerate Safe Vaccine Administration Statewide* (Jan. 7, 2021), https://www.cdph. ca.gov/Programs/OPA/Pages/NR21-008.aspx. .........................................2, 3

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Board of Trustees of the Bay Area Rapid Transit System (BART) ordered its employees to vaccinate for SARS-CoV-2 (COVID-19). Plaintiffs requested religious exemptions and accommodations. Instead of granting any accommodations, BART removed all of the religious objectors from its payrolls. Judgment should be entered on all three claims in the Amended Complaint for the reasons summarized below.

*Free Exercise of Religion:* The process that BART used centered around a mechanism for individualized assessments for which BART examiners had discretion to grant or deny requests for exemption and accommodation. Because of this, the process was not a generally applicable law and thus comes under strict scrutiny review which requires a compelling state interest, narrowly tailored, which uses the least restrictive means.

The Cooper-Plaintiffs concede for this motion that stemming the spread of COVID-19 qualifies as a compelling interest. That notwithstanding, BART failed to use the required narrow tailoring and the least restrictive means to achieve its purpose. It has allowed unvaccinated passengers to enter stations and board carriages. An unvaccinated passenger poses the same threat on a train or at a station as an unvaccinated employee. Whatever health and safety measures that it used for the public, it could have used for employees. Narrow tailoring, and utilizing the least restrictive means, is also undermined because two state departments intimately tied to health and safety and three neighboring counties provided religious accommodations during the same period of between 82 and 100 percent of its employees.

Six Cooper-Plaintiff-employees were denied their requests for religious exemption. Though BART assumed the sincerity of the employees' convictions, it denied the exemptions deeming the requests primarily secular rather than sacred. The manner of the examination of

these beliefs violated the First Amendment religion clauses. This occurred by an analysis and interpretation of religious beliefs that state actors are precluded from undertaking.

*Title VII:* The Cooper-Plaintiffs have made out a prima facie case which includes communicating to BART their uncontested sincere faith that conflicts with the performance of a job duty. Further, in violation of Title VII, BART did not offer accommodation options to the employees. No suggestion for an accommodation by employees was ever accepted.

Good faith efforts initiated by the employer are a prerequisite before moving to undue hardship analysis. Even if BART proves it attempted to negotiate accommodations, it failed to use the proper legal standard for undue hardship. Instead, it used the de minimis cost standard rejected by the U.S. Supreme Court.

*Fair Employment and Housing Act (FEHA):* The legal standard for FEHA for *undue hardship* is stricter on the employer than it is for Title VII. California law requires that the employer face "significant difficulties or expense." In evaluating accommodations, BART's reviewers did not use that standard, and did not even know what the term means. An employer most show *why* and *how* asserted economic reasons would affect its ability to provide a particular accommodation. Because financial considerations were not a factor, BART cannot carry its burden under FEHA and judgment should be rendered against it.

### STATEMENT OF FACTS

The material facts are not in dispute.

#### *General Facts*

In response to the outbreak of COVID-19, in January 2021 the California Department of Public Health (CDPH) announced vaccine recommendations to local public health departments.[1] In that announcement the CDPH informed the public that "free, confidential

---

[1] CDPH, *State Issues Recommendations to Local Health Departments and Providers to Accelerate Safe Vaccine Administration Statewide* (Jan. 7, 2021), https://www.cdph.ca.gov/Programs/OPA/Pages/NR21-008.aspx.

testing is available statewide."[2] During the summer of 2021, a heavy rail public transportation service, BART, provided testing for employees or directed them to places that tested for free.[3]

### *Mandatory COVID-19 Vaccination of BART Employees*

On October 14, 2021, the BART Board of Directors voted 8-1 to issue a mandate requiring all of its employees to submit to vaccination for COVID-19. Snider decl., ¶ 5 (Exh. 5). Employees were required to be fully vaccinated by December 13, 2021. *Id.* In its *Coronavirus Pandemic (COVID-19): Statement of Policy*, BART asserted that "[u]nvaccinated employees are at greater risk of contracting and spreading COVID-19 within the workplace and BART facilities, as well as to the public." *Id.*

Pursuant to federal and state law,[4] BART allowed employees to submit requests for religious exemptions and accommodations so they would not undergo vaccination. In total there were 189 requests for religious exemption for which 70 were granted a religious **exemption**.[5] Maplestone decl., ¶ 14. However, the remaining requests for religious exemption were denied. Of the 70 remaining employees granted a religious exemption, not one religious-objector-employee ultimately received an **accommodation**. *Id.* at ¶ 16.

### *Mechanism for Review*

The process for employees seeking religious exemptions to the vaccination requirement was a uniform system. Thomas depo., 23:4-6; Huynh depo., 10:3-5.[6] Such

[2] *Id.*
[3] See the declarations in support of this motion: Cooper, ¶ 9; Johnson, ¶ 7; Parker, ¶ 3, Rivera, ¶ 9; Turner, ¶ 10.
[4] Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e) and the California Fair Employment and Housing Act (Cal. Gov. Code § 12900 et seq.).
[5] Numerous declarations from Rodney Maplestone have been filed in the related case of *Chavez v. BART* (3:22-cv-06119-WHA). The references to Mr. Maplestone's declaration will be to those filed in support of the Defendant's Opposition to Class Certification. (Ct. Doc. 42-1). See Request for Judicial Notice filed currently with this motion.
[6] This motion will refer to transcripts from the depositions of Gizelle Quinto Huynh (BART Supervisor of Leave Management), Rodney W. Maplestone (BART Manager of Leave Programs), and Veronica Rivera Badong Thomas (BART Human Resources Director). The

employees submitted a standard document created and provided by BART entitled *Employee Request for Religious Exemption (COVID-19 Vaccination)*. Maplestone depo., Exh. 1.

The request for religious exemption would be delivered to a subdivision of the Human Resources Dept. called Leave Management which would confirm that all necessary information was provided. Maplestone depo., 11:15-20. A three-person panel would review requests for religious exemption. This panel would decide whether to grant or deny the request or meet with the employee to get additional information. Maplestone depo., 10:17 to 11:6. Though the same criteria was used for all employees making requests for religious exemption (Huynh depo., 10:11-25; Thomas depo., 21:18-22) each employee request was considered on a case-by-case basis in which the examiners had discretion to approve or deny requests. Huynh depo., 13:2-5, 70:16-23; Maplestone decl., ¶ 15. BART then created a document called *Standard Operating Procedure* for the purpose of interviewing employees. Maplestone depo., Exh. 4; Huynh depo., 10:11-25; Thomas depo., 21:18-22.

Examiners from Human Resources interviewed the religious-objector-employee using a standardized form entitled *Religious Exemption Request Review Form (COVID-19 Vaccination)*. Maplestone depo., Exh. 4. Next, examiners would fill out the form as they questioned the employee requesting a religious exemption. Maplestone depo., 21:23 to 22:4. Finally, BART drafted and used a document called *Religious Exemption Interviews* or "interview notes" which contained (1) four EEOC factors with boxes to be checked, (2) an introduction statement, and, (3) five questions as follows:

1. Can you tell is briefly about your sincerely held belief?
2. Can you tell us in your own words why taking COVID-19 vaccine is contrary to your religious belief?
3. What do you think will happen to you if you take the COVID-19 vaccine?

transcripts have been marked and filed as exhibits to the declaration of Kevin Snider: for Mrs. Huynh, Exhibit 1; for Mr. Maplestone, Exhibit 2; for Mrs. Thomas, Exhibit 3.

4. Can you provide us other examples of how this religious belief is demonstrated in other aspects of your life?

5. You refuse to take the COVID-19 vaccine because of the alleged use of aborted fetal cells in the creation of the vaccine. Research on this topic has revealed some cosmetic and over-the-counter medicines may use the same process the COVID vaccine? [*sic*]. Are you aware of this? Tell me how else you demonstrate the same pre-cautions in your life.

Maplestone depo., Exh. 6.

The forms created by BART were the mechanism used for granting or denying an individualized religious exemption. Huynh depo., 70:11-15. Based on the system used, the reviewer had discretion on a case-by-case basis to determine whether to grant a religious exemption or accommodation for a given employee. Huynh depo., 70:16-20;[7] Maplestone depo., 83:10-18.[8]

For those granted a religious exemption, a letter would be sent to them regarding an accommodation. Religious-objector-employees were asked to submit proposed accommodations. Maplestone depo., 34:17 to 35:18. BART either did not propose any options for accommodation or proposed its own options which it would then reject.[9] Further, BART never directed any employee to check with their respective unions regarding schedule changes as an accommodation.[10] Of the 70 employees granted a religious exemption, not a single one received an accommodation. Maplestone depo., 35:22 to 36:4.

[7] "**Q.** [B]ased on . . . the system or this process . . . the reviewer had the discretion on a case-by-case basis to determine whether to grant a religious exemption for a given employee? **A.** Yes. **Q.** And that's the same for the religious accommodation? **A.** Yes."

[8] "**Q.** [B]ased on . . . employees' responses, you would either grant or deny individualized exemptions; is that right? **A.** Yes, based on everything provided. **Q.** And you had discretion to do that; right? **A.** Yes. **Q.** And is that the same for the religious accommodation; you had discretion on that? **A.** Yes."

[9] See the declarations in support of this motion: Cooper, ¶ 10; Lockett, ¶¶ 9-10; Manzano, ¶ 8; Owens, ¶¶ 8-9; Turner, ¶ 9; Rivera, ¶ 8; Scullion, ¶ 10; Parker, ¶ 11; Gilbert, ¶ 9; Gonzalez, ¶¶ 7-8; Freeman, ¶ 9; Roth, ¶ 10.

[10] See the declarations in support of this motion: Cooper, ¶ 14; Freeman, ¶ 13; Gilbert, ¶ 16; Gonzalez, ¶ 12; Grinchenko, ¶ 11; Lockett, ¶ 14; Manzano, ¶ 12, Owens, ¶ 12; Parker, ¶ 14; Johnson, ¶ 12; Rivera, ¶ 14; Roth, ¶ 13; Scullion, ¶ 12; Sun, ¶ 12; Taylor, ¶ 10; Turner, ¶ 13.

Each religious-objector-employee who did not undergo vaccination was sent a letter giving the employee four options: (1) comply with the vaccination mandate; (2) resign; (3) retire if qualified; or (4) do nothing and be terminated. Ct. Document 1-1, p. 45-80. The four options of this letter served as an ultimatum requiring employees to choose between their jobs and their faith. Unless an employee was vaccinated, the employee was either forced into early retirement, constructively discharged by forced resignation, or simply terminated.

From the time of the vote in October 2021 until mid-December, unvaccinated employees were allowed to work on trains, stations, and other sites. After requests for religious exemptions and accommodations were denied, BART called numerous unvaccinated employees back to work for periods of time.[11] BART allowed thousands of passengers—vaccinated or not—to ride the trains. Maplestone depo., 54:5-8. The Cooper-Plaintiff-employees rode trains for time periods that were similar or less in duration than the general public.[12]

## **STANDARD OF REVIEW**

Rule 56 of the Federal Rules of Civil Procedure allows for summary judgment in the absence of a dispute as to a material fact. In such cases, the movant is entitled to judgment as a matter of law. This litigation can be decided on this motion because of the absence of disputed material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[11]See the declarations in support of this motion: Freeman, ¶¶ 16-17; Gilbert, ¶ 18; Gonzalez, ¶ 15; Lockett, ¶ 17; Owens, ¶ 15; Scullion, ¶ 15; Parker, ¶ 17.
[12] See the declarations in support of this motion: Cooper, ¶ 4; Freeman, ¶¶ 3-4; Gilbert, ¶ 3; Grinchenko, ¶¶ 3-4; Gonzalez, ¶ 3; Johnson, ¶ 3; Lockett, ¶¶ 3-4; Manzano, ¶¶ 3-4; Owens, ¶ 3; Parker, ¶¶ 3-5; Taylor, ¶ 3; Turner, ¶¶ 3-4; Rivera, ¶ 4; Roth, ¶¶ 4-5; Scullion, ¶¶ 3-4; Sun, ¶¶ 3-4.

# ARGUMENT

## I. BART'S PROTOCOL VIOLATED THE FREE EXERCISE OF THE PLAINTIFFS' RELIGION.

A showing under 42 U.S.C. § 1983 requires that the challenged law or conduct occurred (1) under color of law and (2) that such conduct caused a deprivation of a constitutional right. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). Cooper meets both conditions.

### A. BART's conduct was done under color of law.

As a special purpose three-county transit district, BART sits as a state actor and engaged in the conduct at issue under color of law.

### B. BART's conduct interfered with the free exercise of religion.

The second element in a 1983 claim requires the violation of a constitutional right. The U.S. Constitution secures religious liberty which reads, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., amend. I.

#### i. BART's process of review, which resulted in the denial of religious exemptions and accommodations, is subject to strict scrutiny because the process was not a generally applicable regulation.

##### a. BART's process utilized individualized assessments and exemptions.

Neutral and generally applicable government procedures, regulations, and policies may not violate an individual's free exercise of religion if incidentally burdening religion. Under such circumstances, evaluation of these laws and activities come under rational basis review. *Emp't Div. v. Smith*, 494 U.S. 872, 878-82 (1990). But a law not neutral or generally applicable "must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

BART instituted a system to make individualized exemptions to vaccination. The determination for both religious exemptions and accommodations were performed on a case-

by-case basis and fell at the discretion of the BART reviewers in Leave Management. Huynh depo., 70:11-23; Maplestone depo., 82:18 to 83:18. When the government puts in place a regulatory process which includes a mechanism for individualized assessments, the process is not generally applicable. *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). In other words, a law is not generally applicable if it "invite[s]" the government to consider the particular reasons for a person's conduct by providing "'a mechanism for individualized exemptions.'" *Smith*, 494 U.S. at 884 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986) (opinion of Burger, C. J., joined by Powell and Rehnquist, JJ.)). In deposition testimony, a BART examiner explicitly acknowledges such a mechanism:

> **Q.** So when considering whether a Request for Religious Exemption was granted, BART looked at the particular reasons for the employee's request; is that fair to say?
> **A.** Yes.
> **Q.** And the employee request forms and the request review forms, those were the mechanism created by . . . BART for granting or denying an individualized religious exemption?
> **A.** Yes, they're part of the process.
> **Q.** . . . And based on these individualized -- the system or this process, as you say, the reviewer had the discretion on a case-by-case basis to determine whether to grant a religious exemption for a given employee?
> **A.** Yes.

The cases of *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Smith* are instructive. *Sherbert* involved the denial of unemployment benefits for "good cause." *Id.* at 401. The unemployment benefits law in *Sherbert* fell outside general applicability because the "good cause" standard permitted the government to grant exemptions based on the circumstances underlying each application. *See*, *Smith*, 494 U.S., at 884 (citing *Roy*, 476 U.S., at 708; *Sherbert*, 374 U.S., at 401, n. 4). BART's review process parallels this. The *Smith* Court explained that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without [a] compelling reason." *Smith*, 494 U.S. at

884 (cleaned up). BART's process of review suffers from the same problem in that it gave discretion to approve or deny religious-employee requests.

### b. BART allowed similar secular conduct of the unvaccinated public which it prohibited for unvaccinated employees.

Besides the mechanism for individualized exceptions determined at the discretion of BART's Leave Management, BART also permitted certain secular conduct while prohibiting similar religious conduct. BART allowed passengers to ride trains and congregate at stations who were unvaccinated. Yet BART would not allow unvaccinated employees to work at these same venues. Indeed, the evidence is not subject to dispute that the Cooper-Plaintiffs typically rode the trains for no longer than general public passengers. *See*, fn. 12. A law lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way. *Lukumi*, at 542-46. In that an unvaccinated passenger on a train or at a station poses an identical health and safety risk as an unvaccinated employee, BART's policy based on public health concerns is under inclusive.

When the government bases its restrictions on public health, as did BART, but fails to impose the same restrictions on others for the same conduct, this under-inclusiveness fails strict scrutiny. For instance, in *Lukumi* a municipality adopted several ordinances prohibiting animal sacrifice, a practice of the Santeria faith. *Id.* at 524-28. The city claimed that the ordinances were necessary in part to protect public health, which was "threatened by the disposal of animal carcasses in open public places." *Id.* at 544. But the ordinances did not regulate hunters' disposal of their kills or improper garbage disposal by restaurants, both of which posed a similar hazard. *Id.* at 544-45. The Court concluded that this and other forms of under-inclusiveness meant that the ordinances were not generally applicable. *Id.* at 545-46. Similarly, in that BART allowed general public passengers—with vaccination status unknown—to travel on the rail system, the policy is under inclusive.

## ii. To satisfy strict scrutiny review BART must demonstrate a compelling state interest.

The Cooper-Plaintiffs concede, for purposes of this motion, that stemming the spread of COVID-19 comprises a compelling state interest. *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020).

### a. To satisfy the exacting standard of strict scrutiny, BART was obligated to narrowly tailor its requirements.

The identification of a compelling state interest is not the end of the inquiry. To justify the burden on free exercise, the government carries the obligation to demonstrate a compelling governmental interest that must be narrowly tailored to advance that interest. *Lukumi*, 508 U.S. at 531-32.

Narrow tailoring requires the State to show that "measures less restrictive of the First Amendment activity could not address its interest." *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021). BART must demonstrate that "the religious exercise at issue is more dangerous than" the general public riding trains "even when the same precautions are applied. Otherwise, precautions that suffice for other activities suffice for religious exercise too." *Id.*; *see also*, *Roman Catholic Diocese*, 141 S. Ct. at 69; *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (2021)(J. Gorsuch statement).

Under *Tandon*, comparability for purposes of the Free Exercise Clause "must be judged against the asserted government interest that justifies the regulation at issue." *Id.* If the asserted interest of BART is public health, then permitting the general public— vaccinated or not—to ride trains is the proper comparator. To this point, BART decisionmakers in Human Resources were specifically questioned on this. Gizelle Huynh served as the Supervisor of Leave Management. She was asked, "***Q:*** Do you know if it was BART's view that unvaccinated employees posed an immediate danger to anyone? ***A:*** I don't remember." Huynh depo., 13:25 to 14:3. More explicitly, the Director of BART's Human Resources, Veronica Thomas, was directly asked, "**Q:** Were you ever told by someone in

BART management that unvaccinated employees would pose a danger of some kind? **A:** No." Thomas depo., 28:13-16.

BART's approach can be contrasted to Santa Clara County's vaccination mandate for its employees. In a free exercise case brought by county employees, unlike BART the County did "not exercise any discretion in granting a religious exemption once it determined that the exemption was sought for a religious reason." *UnifySCC v. Cody*, 2022 U.S. Dist. Lexis 116386 at *20-21 (N.D. Cal. June 30, 2022). In stark contrast to BART's individualized exemption procedure, the County looked to the face of its religious exemption request form "only to determine if the objection [was] in fact religious in nature." That "limited inquiry [was] permissible." *Id.* at *19. Thus, the County avoided a mechanism of individualized discretion that the Supreme Court articulated in *Fulton*, 141 S. Ct. at 1878.

Although the rule in *Tandon* was not yet fully developed, the Ninth Circuit found a state mandate meant to ensure access to abortion-inducing prescriptions generally applicable because no individualized exemptions were relevant to the corporate pharmacy. The exemptions for not selling the drugs in question involved inability to pay, suspicion of a fraudulent prescription, and lack of specialized equipment to produce a given drug. Based on these government interests, the panel noted that "the exemptions at issue are tied directly to limited, particularized, business-related, objective criteria, [and] they do not create a regime of unfettered discretion that would permit discriminatory treatment of religion or religiously-motivated conduct." *Stormans v. Weisman*, 794 F.3d 1064, 1082 (9th Cir. 2015). This is consistent with the not yet extant rule requiring a comparison of an exemption to the "asserted government interest" set out in *Tandon*, 141 S. Ct. at 1296 (2021). In contrast, BART's system of individualized exemptions was of a different genre than that found in *Stormans*, triggering the rule in *Fulton*.

*Doe v. San Diego U.S.D.*, 19 F.4th 1073 (9th Cir. 2021), further illustrates the importance of accommodations in the free exercise context. A public school mandated COVID-19 vaccination for its students. Instead of BART's absolutist approach, the school offered accommodations to students seeking exemptions, in the form of online learning. As the panel majority explained, "The . . . policy prevents [the student] only from attending school in person and from participating in school sports, not from receiving a public education, participating in private sports leagues, or fully practicing her religion." *Id.* at 1114 (Berzon and Bennett, concurring in denial of rehearing and rehearing en banc). Ironically, what the school offered was strikingly similar to the accommodations sought by several of the present Plaintiffs to work from home. Unlike the school, BART refused to even consider such alternatives.

### b. Constitutional obligations require BART to use the least restrictive means available.

Government is not free to disregard the First Amendment in times of crisis. At a minimum, that Amendment prohibits government officials from treating religious exercise worse than comparable secular activities, unless pursuing a compelling interest that utilizes the least restrictive means available. *See*, *Lukumi*, 508 U.S. at 546; *Roman Catholic Diocese*, 141 S. Ct. at 69 (J. Gorsuch concur).

As a government employer, BART must show that "public health would be imperiled" by "employing less restrictive measures" than requiring a fully vaccinated workforce. *Tandon*, 141 S. Ct. at 1297 (quoting *Roman Catholic Diocese*, 141 S. Ct. at 68). This it cannot do.

The *least restrictive means* test is a constitutionally required, exacting standard that stands far apart from an employer's desire to use the *most effective means*. In the numerous COVID-church-closure cases the most effective means of protecting the public and preventing the spread of the disease was to keep people out of their sanctuaries. Though this view was

fortified by unchallenged expert opinion,[13] it was rejected by the Supreme Court which steadfastly held to the least restrictive means test rather than what was optimal. *See, Roman Catholic Diocese*, 141 S. Ct. at 69; *South Bay Pentecostal*, 141 S. Ct. at 718 (Gorsuch statement); *Tandon*, 141 S. Ct. at 1298 ("strict scrutiny requires the State to further 'interests of the highest order' by means "narrowly tailored in pursuit of those interests . . . That standard is not watered down. It really means what it says." *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021)(same)).

In relying on the errant *most effective means* position, in numerous memoranda to religious-objector-employees to vaccination describing why BART would not provide an accommodation, Leave Management points to the California Department of Public Health (CDPH). Standard language given to employees by Leave Management provides, "According to the . . . CDPH, vaccination is the most effective method to prevent transmission and limit COVID-19 hospitalizations and death." Maplestone depo., 50:7-10. BART's reliance on the CDPH for its jab or job ultimatum actually undermines the burden of proving narrow tailoring that uses the least restrictive means to achieve a compelling government interest. As an employer, CDPH treated its religious-objector-employees much differently than BART. A response to a request for public records[14] shows that between January 1, 2021, and December 31, 2022, 156 CDPH employees requested a religious accommodation to the COVID-19

---

[13] "Members of this Court are not public health experts, and we should respect the judgment of those with special expertise and responsibility in this area. But even in a pandemic, the Constitution cannot be put away and forgotten. The restrictions at issue here . . . strike at the very heart of the First Amendment's guarantee of religious liberty." *Roman Catholic*, 141 S. Ct. at 68. Like the State of New York in *Roman Catholic*, the *Tandon* dissenters made the same argument as BART relative to experts. "The district court found each of these facts based on the uncontested testimony of California's public-health experts." *Id.* at 1298 (J. Kagan dissenting). That did not carry the day then and should not now. When the First Amendment is at stake, the Supreme Court will no longer allow experts to dictate the analysis.

[14] Records were requested pursuant to the California Public Records Act. Cal. Gov. Code § 7920 et. seq. See Snider decl., ¶¶ 6-8.

vaccination. CDPH gave accommodations to all 156 employees. Snider decl., ¶ 6 at Exh. 6. Since the state entity charged with setting public health policy for Californians—and relied on by BART—can accommodate its employees, there was no reason that a five-county train district cannot accommodate its 188 employees seeking religious accommodations? [15]

Or consider the California Department of Industrial Relations. Though requiring employee vaccination, unvaccinated workers were simply required to undergo weekly testing of its employees. An exception occurred when employees regularly visited sensitive workplaces such as hospitals, skilled nursing facilities, jails/prisons, food processing facilities, or senior care facilities. For those unvaccinated employees, twice weekly testing was required. *Id.* The question must be asked, if the state entity which monitors workplace health and safety managed COVID-19 through testing, why couldn't BART? BART's mass employee termination was surely not the least restrictive means to achieve a compelling state interest.

A review of some of the neighboring San Francisco Bay Area counties is also informative. Contra Costa County is one of the five districts serviced by BART. Between January 1, 2021, and December 31, 2022, there were 971 employees which sought a religious exemption from COVID-19 vaccination, 959 of which were granted. Snider decl., ¶ 7, Exh. 7. In Solano County, 23 employees requested accommodation for which 19 were granted. *Id.* In Santa Clara County, approximately 1,236 employees requested religious exemptions to the vaccine; that county accommodated 1,164 employees during that timeframe. *Id.*

In view of these comparisons, BART did not use the lease restrictive means. Purging its religious employees was the **most** restrictive means.

[15] Although those working in public transportation were deemed essential workers, it does not follow that mandatory vaccination was even required. The Sacramento Regional Transit District, which includes a light rail train system, did not mandate vaccination. Snider decl., ¶ 8, Exh. 8.

### iii. The system of individualized review comprised an unconstitutional examination of religious beliefs under color of law.

Six employees were denied their requests for an exemption when BART examiners probed employee convictions to see if they were primarily religious or secular. The requests of these six employees and the reasons for the denials are memorialized and part of the record, are not disputed, and are summarized below.

*Jim Lasovich* is a Roman Catholic employee who requested a religious exemption based on his pro-life beliefs. To explain his faith he provided scriptures, an explanation about his Church's theology in the right to conscience, and a letter from Priests for Life. The examiners took issue with the letter because it did not come from his church but from an "anti-abortion political organization." Huynh depo., 46:10-16. In deposition, a BART examiner was asked whether there was anything in the letter from Priests for Life that could be interpreted as political rather than religious. Answer: *no. Id.* at 49:9-15. Asked about the importance of getting a letter from the employee's church rather than Priests for Life as factoring into the decision, the examiner stated, "I think [the letter] . . . just supported the fact that if you have this belief and you're consistently attending the [church] services versus saying you have a belief and just . . . getting a letter from someone that you don't normally attend." Then asked if she had an "understanding as to whether or not the Roman Catholic [C]hurch's teaching itself has a pro life theology," she answered, "I don't know." She also stated that it depends on the church that one attends. Asked if the examiners factored in whether the church an employee attends was not pro-life, but the employee was himself pro-life, the response was, "I'm sure we considered it." *Id.* at 50:20 to 51:12.

*La Ron Johnson's* belief system is Hebraism. Mr. Johnson's conviction is that God controls life and death and that "getting a vaccine won't stop you from dying when God ordained for you to die." Ct. Doc. 1-1:24-25. He cited six passages from the Bible in support of his theological viewpoint. Mr. Johnson provided certain scientific statistics to explain the

practical application of faith-based convictions, ending with "my faith requires us to look to God for protection and not man." Johnson decl., ¶ 9. Though some may view that as fatalistic, that does not make it any less religious. BART denied his request claiming it was secular. *Id.*

*Sergii Grinchenko* believes that his body is the temple of the Holy Spirit. He wrote the vaccine "purport[s] to instruct [the] human body to produce a spike protein that is not natural to our own human genetic system. The possibility of genetically changing the human body, the body created by God in His image [,] goes against my religious beliefs." Ct. Doc. 1-1:22. BART examiners denied his requested exemption claiming that Mr. Grinchenko stated "secular reasons such as the vaccine not being safe and may harm his body. It is unclear if his belief is part of a comprehensive belief system." Huynh depo., Exh. 26.

Besides serving as a BART employee since 2003, *Albert Roth* is also an ordained minister. Huynh depo., 52:20-21. He believes that his physical body is the "sacred temple of God" and that potential harm to his body through vaccines is wrong. Ct. Doc. 1-1:55-56. His request for religious exemption was denied. In Mr. Roth's interview he stated he did not want to cause harm to his healthy body explaining that he wanted to "do[ ] what is right." BART examiners deemed "doing right" a nonreligious reason. In deposition testimony the examiner admits that Mr. Roth "does want to have the choice of what he puts in his body because he wanted to be pleasing to God." *Id.* at 57:13-15. Nonetheless, his religious exemption was denied.

In answering BART's exemption form which asks for his "religion or personal belief(s) system," *Nicholas Taylor* states that it is "Personal Ethics." He does not want to take the vaccine that uses aborted fetal cells stating that his family "view[s] abortion as a moral sin." Ct. Doc. 1-1:67. His religious exemption request was denied because use of "aborted fetal cells is not in connection with a comprehensive belief system." Huynh depo., Exh. 20.

*Szu-Cheng Sun* belongs to a minority religion called Ruism.[16] This employee prays twice per day with a burning stick and meditates for an hour once per week. He explained, that "every hair and bit of skin" comes from one's parents. Ruists "must not . . . injure or wound them." Ct. doc. 1-1:61. Thus, Ruists do not allow tattoos or piercing. *Id.* For health purposes, nature is best and "human intervention should be kept as less as possible." *Id.* Because of this, Mr. Sun has not had a vaccine since 1980. BART examiners denied his request for a religious exemption claiming that his reasons were "primarily secular/nonreligious." Maplstone depo., Exh. 7. When questioned about Ruism, the BART examiner admits that he is unfamiliar with it. Maplestone depo., 79:19-22. That notwithstanding, BART engaged in its own analysis of this belief to determine if it was secular.

When asked in deposition if he had done any reading, formal or informal studies in religion or theology to be able to evaluate the religious beliefs of employees, an examiner answered *no*. Maplestone depo., 62:3-14. Likewise, the other BART examiner was asked, "In reviewing the requests for religious exemptions, did you study up on any religions or theology?" Her answer was, *no*. Huynh depo., 20:15-18.

BART's examination and decision making is problematic under both the Establishment and Free Exercise Clauses. First, the examination fails neutrality. Though BART does not question sincerity, it examined whether a stated belief was religious enough to satisfy the interviewer. Faith—which is intrinsically subjective—cannot be put through a crucible of state-determined objective criteria. It is self-evident that "faith is . . . impossible to justify through reason." *Davila v. Gladden*, 777 F.3d 1198, 1204 (11th Cir. 2015).

To the nonadherent, a religious conviction may come across as illogical, incomprehensible, or inconsistent. Nonetheless, a belief sincerely held rests as fully protected under the First Amendment. *Thomas v. Review Bd. of Ind. Employment Security Div.*, 450 U.S. 707,

---

[16] Ruism is also known in the West as Confucianism. *See*, ruistassociation.org.

714 (1981). The notion that a religious employee must explain himself to the satisfaction of a government employer—even in connection with employment laws—cannot be reconciled with the religion clauses. The constitutional guarantee of religious liberty is not only for the articulate. It is available to the common man. "Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs." *United States v. Ballard*, 322 U.S. 78, 86 (1944).

The inquisitorial posture of the BART examiners also fail general applicability. Beyond the mechanism for granting individualized exemptions, the case-by-case determination conducted here is of the most noxious kind under the First Amendment. BART's insistence that this system should be distinguished from *Fulton* because not performed solely by an individual but by a three-person panel cannot save it. First Amendment wrongs have never been turned into rights due to the number of perpetrators. *See*, *Ballard*, 322 U.S. at 86 (jury panel); *Lukumi*, 508 U.S. at 546 (city council); *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018)(civil rights commission)("[I]t hardly requires restating that government has no role in deciding or even suggesting whether the religious ground for [a] conscience-based objection is legitimate or illegitimate.").

The government lacks the actual and legal capacity to second guess an employee's faith because religious experiences "which are as real as life to some may be incomprehensible to others." *Ballard*, 322 U.S. at 87. The First Amendment protection of religious liberties by necessity requires guarding the individual's ability to refuse to participate in activities that their faith prescribes. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). Surely that includes vaccination.

Cooper-Plaintiffs' Motion for Partial Summary Judgment

Finally, BART did not challenge the sincerity of the convictions of the employees requesting religious exemptions.[17] Instead, BART asserted that the employees' requests were primarily nonreligious rather than faith-based. This question is not proper for a jury because requiring a citizen to prove his or her faith at trial harkens back to the Inquisition. What is more, there is no dispute of fact as to the reasons proffered by the employees. These reasons are set forth in their requests and are in the record. Whether the reasons are primarily religious or secular is an issue of law that the bench must decide. This makes the 1983 claim appropriate for determination on summary judgment.

## II. THE COOPER-PLAINTIFFS SHOULD PREVAIL UNDER TITLE VII.

Title VII makes it unlawful for an employer to discriminate against an employee based on religion. *See*, 42 U.S.C. § 2000e-2(a); Cal. Gov. Code § 12940(a). Courts use a two-part framework to analyze a Title VII claim, one part for employees and one part for employers. *EEOC v. Autonation United States Corp.*, 52 F. App'x 327, 329 (9th Cir. 2002).

### A. The Cooper-Plaintiffs have made a prima facie showing under Title VII.

First, the employee must establish a prima facie case of discrimination. This requires the following showing: (1) a bona fide religious belief; (2) the practice of the belief conflicted with an employment duty; (3) the employee informed the employer of that belief and conflict; and (4) the employer threatened or subjected the employee to discriminatory treatment, including discharge, because of an inability to fulfill the job's requirements. *Id.*

The Cooper-Plaintiffs easily carry their burden. First there is no dispute that their beliefs were bona fide. In a sworn declaration, BART's primary examiner in Leave Management stated that BART assumed the sincerity of beliefs of employees. Maplestone decl., ¶ 9. This is as it should be. When a worker clings to religious beliefs in the face of a loss

---

[17] BART Op. to motion for class certification, 6:20-21, *Chavez v. BART* (3:22-cv-06119 WHA) Ct. Doc. 41; Maplestone decl., (re class certification), ¶ 9, Ct. Doc. 42-1; Maplestone depo., 64:22 to 65:7; Huynh depo., 31:2-5, 35:14-22;

Cooper-Plaintiffs' Motion for Partial Summary Judgment

of a job, there can be little doubt of the sincerity of the employee's faith. *McGinnis v. U.S. Postal Service*, 512 F. Supp. 517, 520 (1980). Faced with just such a choice, the Cooper-Plaintiffs have authenticated the sincerity of their beliefs.

There can be no dispute that the Cooper-Plaintiffs' beliefs conflicted with the job duty of vaccination for COVID-19 per BART's mandate. Further, through the use and submission of the request for religious exemption forms provided by BART, the employees communicated the conflict to their employer. Finally, the employees were forced out of their jobs. Thus, the Cooper-Plaintiffs make a prima facie showing under Title VII. *Autonation*, 52 F. App'x at 329.

**B. BART's conduct is inconsistent with Title VII's "good faith effort" requirement.**

The employer must prove that it *initiated* good faith efforts to accommodate the employee's religious practices before moving to an undue hardship analysis. *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993). "[A]t a minimum, the employer [is] required to negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1513 (9th Cir. 1989). Sadly, BART offered nothing, even though "[t]he burden of attempting an accommodation rests with the employer rather than the employee." *EEOC v. Townley Eng. & Mfg. Co.,* 859 F.2d 610, 615 (9th Cir. 1988).

> It is clear that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business. An employee's "concomitant duty" to cooperate, however, arises only *after* the employer has suggested a possible accommodation.

*Heller*, 8 F.3d at 1440 (citing *Ansonia Bd of Educ. v. Phillbrook,* 479 U.S. 60, 69 (1986) (quoting *Brener v. Diagnostic Ctr. Hosp.,* 671 F.2d 141, 145-46 (5th Cir. 1982)). It is undisputed that BART did not offer any accommodation options available for acceptance to religious

employees who held convictions against vaccination. BART placed the entire onus on the employees to suggest accommodation options. No matter the suggestion, BART could not be assuaged.

A comparison to other state and local government employers is instructive. As discussed in the section on *least restrictive means* the CDPH accommodated 100 percent of its religious employees' requests as did the Dept. of Industrial Relations. Contra Costa County granted 98.8 percent. Solano County granted 82.2 percent. Santa Clara County granted 94.2 percent.

Title VII does not demand mere neutrality with regard to religious practices but instead, "gives them favored treatment." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015). The reason for this is to ensure that religious adherents enjoy full participation in the workforce. *Id.* That is how the other state and county government peers of BART rightly understood their legal obligations. BART clearly did not. Thus, BART's refusal to grant even one request for religious accommodation—out of 189 attempts—cannot be squared with Title VII.

As discussed under the *narrow tailoring* and *least restrictive means* sections above, BART could have accommodated employees by the use of testing as did the state agency in charge of health and safety of its own employees. Beyond that, the claimed risk to the public was belied (1) by allowing unvaccinated employees to work through the vaccination deadline at BART venues (Thomas depo., 30:21-23; Maplestone depo., 59:21 to 60:13),[18] (2) calling numerous unvaccinated employees back to work for periods of time after their religious exemption and accommodation requests were denied (Thomas depo., 30:24 to 31:2),[19] and (3) allowing the general public to ride the trains (Maplestone depo., 55:19-25). Therefore, the

[18] *See also*, the declarations of Freeman, ¶¶ 16-17; Gilbert, ¶ 18; Gonzalez, ¶ 15; Lockett, ¶ 17; Owens, ¶ 15; Scullion, ¶ 15; Parker, ¶ 17.
[19] *See also*, the declarations of Cooper, ¶ 16; Freeman, ¶ 16; Gilbert, ¶18; Grinchenko, ¶ 13; Lasovich, ¶ 4; Lockett, ¶ 16; Parker, ¶ 16; Roth, ¶ 16; Scullion, ¶ 14; Taylor, ¶ 12; Turner, ¶ 15.

denial of the requests for accommodation did not meet the reasonableness standard required under Title VII.

### i. The standard for *undue hardship* is not imposition of a de minimis cost on the employer.

*After* proving that it made those good faith efforts and that these attempts were unsuccessful, the employer must show an undue hardship. *Anderson v. Gen. Dynamics Convair Aerospace Div.*, 589 F.2d 397 (9th Cir. 1978).

As an initial matter, BART cannot meet its burden shifting requirement because it evaluated employee requests using the wrong legal standard. By beginning with the wrong legal premise, the wrong result was preordained. In defense of its denial of accommodations, BART followed a "de minimis" standard for undue hardship. Using identical language in its correspondence of denial of accommodations to the Cooper-Plaintiffs, as well as filings with the EEOC, BART wrote, "An employer can deny an accommodation request if it imposes more than **a de minimis cost** on the employer's business. 42 U.S.C. § 12111(10)(A); 29 C.F.R. § 1605.2." Snider decl., ¶ 4, Exh. 4 (emphasis added). Earlier this year, the Supreme Court made clear that use of the imposition of a de minimis cost on the employer misreads the statute.

Under Title VII an undue hardship, as delineated by a unanimous Supreme Court, requires that "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy, Postmaster General*, 143 S. Ct. 2279, 2295 (2023). BART did not follow that standard. Examiners in Human Resources disavowed financial considerations for accessing undue hardship. Maplestone depo., 52:2-21.

Despite its ubiquitous representations to the EEOC, BART may attempt to run from its reliance on the de minimis burden claiming that the reason for its unwillingness to accommodate religious objectors was exclusively based on public health rather than cost.

This is essentially a claim that *Groff* has no relevance to this case. BART cannot make legal representations to the EEOC of regarding the de minimis cost and change its story on summary judgment. Moreover, if BART did not use the de minimis cost standard per its representations to the EEOC, the question is, what standard did it use. Further, what is the legal basis for that standard?

## III.  BART'S FAILURE TO ACCOMMODATE EMPLOYEES VIOLATED FEHA.

The standard for accommodation is different under FEHA than Title VII. Per California law an employer unwilling to provide an accommodation to employees must show that the accommodation would visit a *significant difficulty or expense* on it. Cal. Gov. Code § 12926(u).[20] This constitutes a more stringent standard than found in Title VII. The Supreme Court noted the employee in *Groff* wanted the high court to define *undue hardship* as "significant difficulty or expense." *Groff,* 143 S. Ct. at 2295. Of course, that is the language from FEHA and the ADA. That the Supreme Court did not accept that definition underscores the fact that California's standard, which mirrors the ADA definition, presents a higher hurdle for employers to clear.

When specifically asked whether accommodation would cause BART any "significant difficulty or expense," the Manager of BART's Leave Program did not know what that term meant. Maplestone depo., 53:9 to 54:4. If unfamiliar with California's standard, the Manager would not be able to view accommodation options in accordance with FEHA's requirements.

Understanding the standard for undue hardship is crucial and is set out in Cal. Gov. Code § 12926(u) which provides:

> (1)  The nature and cost of the accommodation needed.
> (2)  The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.
> (3)  The overall financial resources of the covered entity, the overall size of the

---

[20] California borrows the definition for *undue hardship* from the ADA. 42 U.S.C. § 12111(10)(A).

23

business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.

(4) The type of operations, including the composition, structure, and functions of the workforce of the entity.

(5) The geographic separateness or administrative or fiscal relationship of the facility or facilities.

The five FEHA factors are grounded in the economic conditions of the employer. "Thus, under California law . . . an employer must show *why* and *how* asserted economic reasons would affect its ability to provide a particular accommodation." *Atkins v. City of Los Angeles*, 8 Cal. App. 5th 696, 734 (Cal. Ct. App. 2017)(emphasis in original). As discussed above in the Title VII section on undue burden, the costs to BART, if considered at all, were a negligible factor. Since BART cannot provide evidence as to why and how economic reasons would affect its ability to provide a particular accommodation, judgment should be rendered against it under the FEHA claim.

## <u>CONCLUSION</u>

In sum, BART's policy of purging its rolls of religious employees falls short of its constitutional obligations under strict scrutiny review for failure to employ narrow tailoring and use of the least restrictive means. Instead, BART used the most restrictive means. Concerning Title VII, BART failed its obligations to initiate good faith efforts to accommodate employees. Further, BART also used the wrong legal standard for undue hardship for Title VII and undue hardship under FEHA.

In view of the above, the motion for partial summary judgment should be granted to the Cooper-Plaintiffs on all three claims, and the case should go to trial solely on damages.

Dated: February 5, 2024

/s/ Kevin T. Snider
Kevin T. Snider
Matthew B. McReynolds
Milton E. Matchak

*Attorneys for Plaintiffs*

24