1   GLYNN, FINLEY, MORTL,
    HANLON & FRIEDENBERG, LLP
2   JAMES M. HANLON, JR., Bar No. 214096
    VICTORIA R. NUETZEL, Bar No. 115124
3   DAWSON P. HONEY, Bar No. 347217
    One Walnut Creek Center
4   100 Pringle Avenue, Suite 500
    Walnut Creek, CA 94596
5   Telephone: (925) 210-2800
    Facsimile: (925) 945-1975
6
    SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT
7   OFFICE OF THE GENERAL COUNSEL
    SAM N. DAWOOD, Bar No. 178862
8   2150 Webster Street, 10th Floor
    Oakland, CA 94612
9   Telephone: (510) 464-6015
    Facsimile: (510) 464-6049
10
    Attorneys for Defendant
11  San Francisco Bay Area Rapid Transit District

12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                                    )   Case No. 3:22-cv-09193-WHA
16  JERAMIAH COOPER, RONALD           )
    FREEMEN II, ADRIAN GILBERT,       )
17  SILVERIO GONZALEZ, SERGII         )   **BART'S OPPOSITION TO**
    GRINCHENKO, LARON JOHNSON, JIM    )   **PLAINTIFFS' MOTION FOR**
18  LASOVICH, RAYMOND LOCKETT,        )   **PARTIAL SUMMARY JUDGMENT**
    MICHAEL MANZANO, TERESA           )
19  OWENS, ROSALIND PARKER, RYAN      )
    RIVERA, ALBERT ROTH, JIM          )   Date:     March 28, 2024
20  SCULLEN, SC SUN, NICK TAYLOR, and )   Time:     8:00 a.m.
    DAROLYN TURNER,                   )   Crtrm:    12
21                                    )   Judge:    Hon. William H. Alsup
                    Plaintiffs,       )
22                                    )
         vs.                          )
23                                    )
    SAN FRANCISCO BAY AREA RAPID      )
24  TRANSIT DISTRICT,                 )
                                      )
25                  Defendants.       )
                                      )
26  _____  )

27

28

_____

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................1

II.     RELEVANT FACTUAL BACKGROUND..........................................................2

        A.      BART's Vaccine Mandate....................................................................2

        B.      BART's Consideration of Requests for Religious Exemption and
                Accommodation....................................................................................3

        C.      BART's Health and Safety Concerns Were Well Grounded.................5

III.    ARGUMENT ......................................................................................................7

        A.      BART's Religious Exemption Process Did Not Violate Plaintiffs'
                Rights of Free Exercise.........................................................................7

                1.      BART's Vaccine Mandate Was a Neutral Law of General
                        Applicability Subject to Rational Basis Review ........................8

                        a.      *Fulton* Did Not Hold that <u>Any</u> Individualized Consideration
                                Renders an Exemption Process Not Generally Applicable.........9

                        b.      BART's Vaccine Mandate Was Neutral...................................11

                        c.      BART's Vaccine Mandate Was Generally Applicable ............12

                2.      BART's Vaccine Mandate Satisfies Rational Basis Review..........16

                3.      BART's Vaccine Mandate Would Satisfy Strict Scrutiny Review,
                        Were It Appropriate ................................................................17

        B.      Plaintiffs Are Not Entitled to Summary Judgment on Their Title VII Claims......21

        C.      Plaintiffs Are Not Entitled to Summary Judgment on Their FEHA Claims..........24

IV.     CONCLUSION..................................................................................................25

1

**TABLE OF AUTHORITIES**

2

3

<u>CASES</u>

4

*Aukamp-Corcoran v. Lancaster General Hospital*
 No. 19-5734, 2022 WL 507479 (E.D. Pa. Feb. 18, 2022) ................................................ 24

5

6

*Barrington v. United Airlines, Inc.*
 566 F. Supp. 3d 1102 (D. Colo. 2021) ................................................................................ 24

7

*Beyene v. Coleman Security Services, Inc.*
 854 F.2d 1179 (9th Cir. 1988) ............................................................................................ 16

8

9

*Bolden-Hardge v. Office of California State Controller*
 63 F.4th 1215 (9th Cir. 2023) ............................................................................................ 25

10

11

*Bordeaux v. Lions Gate Entertainment, Inc.*
 No. 2:22-cv-04244, 2023 WL 8108655 (C.D. Cal. Nov. 21, 2023) ........................... 23, 24

12

*California Fair Employment & Housing Commission v. Gemini Aluminum Corp.*
 122 Cal. App. 4th 1004 (2004) ........................................................................................ 7, 8

13

14

*Celotex v. Catrett*
 477 U.S. 317 (1986) ....................................................................................................... 24, 25

15

16

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*
 508 U.S. 520 (1993) .................................................................................................. 9, 11, 17

17

*Claar v. Burlington Northern Railroad*
 29 F.3d 499 (9th Cir. 1994) ............................................................................................... 16

18

19

*Dennison v. Bon Secours Charity Health System Medical Group, P.C.*
 No. 22-CV-2929, 2023 WL 3467143 (S.D.N.Y. May 15, 2023) ................................. 23, 24

20

*Doe v. San Diego Unified School District*
 19 F.4th 1173 (9th Cir. 2021) ........................................................................................... 9, 12

21

22

*Does 1-6 v. Mills*
 566 F. Supp. 3d 34 (D. Me. 2021) ............................................................................... 11, 17

23

*Dr. T. v. Alexander-Scott*
 579 F. Supp. 3d 271 (D. R.I. 2022) ..................................................................................... 8

24

25

*Employment Division, Department of Human Resources of Oregon v. Smith*
 494 U.S. 872 (1990) ........................................................................................................... 8, 9

26

*Fallon v. Mercy Catholic Medical Center of Southeast Pennsylvania*
 877 F.3d 487 (3d Cir. 2017) ................................................................................................. 8

27

28

1

## <u>TABLE OF AUTHORITIES</u>
Continued

2

3

*Fulton v. City of Philadelphia*
4
    141 S. Ct. 1868 (2021) ........................................................................................... *passim*

5

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ....................................................................................................... 22

6

*George v. Grossmont Cuyamaca Community College District Board of Governors,*
7
    Case No. 22-cv-0424, 2022 WL 16722357 (S.D. Cal. November 4, 2022) ..................... 10

8

*Heller v. EBB Auto Co.,*
    8 F.3d 1433 (9th Cir. 1993) .......................................................................................... 22

9

*Jacobson v. Massachusetts,*
10
    197 U.S. 11 (1905) ........................................................................................................... 8

11

*Kane v. De Blasio,*
    19 F.4th 152 (2d Cir. 2021) .................................................................................... *passim*

12

*Kennedy v. Bremerton School Disttrict,*
13
    __ U.S. __, __ S. Ct. __, 2022 WL 2295034 (U.S. Jun. 27, 2022) ........................... 12, 17

14

*Kushner v. N.Y.C. Department of Education,*
15
    No. 22-cv-5265, 2023 WL 6214236 (E.D.N.Y. Sept. 25, 2023) ..................................... 23

16

*Malik v. Brown,*
    16 F.3d 330 (9th Cir. 1994) ............................................................................................ 8

17

*O'Hailpin v. Hawaiian Airlines, Inc.,*
18
    583 F. Supp. 3d 1294 (D. Haw. 2022) .......................................................................... 24

19

*Opuku-Boateng v. State of California,*
    95 F.3d 1461 (9th Cir. 1996) ......................................................................... 7, 8, 22, 23
20

*Orr v. Bank of America,*
21
    285 F.3d 764 (9th Cir. 2002) ................................................................................... 16, 18

22

*Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) ................................................................................... 9, 17
23

*Pilz v. Inslee,*
24
    No. 3:21-cv-05735, 2022 WL 1719172 (W.D. Wash. May 27, 2022) ....................... 12, 13

25

*Prince v. Massachusetts,*
    321 U.S. 158 (1944) ......................................................................................................... 8
26

*Robinson v. Children's Hospital Boston,*
27
    No. 14-10263, 2016 WL 1337255 (D. Mass. Apr. 5, 2016) ........................................... 24

28

1

## TABLE OF AUTHORITIES
Continued

2

3

*Roman Catholic Diocese of Brooklyn v. Cuomo*,

4
 __ U.S. __, 141 S. Ct. 63 (2020)................................................................. 16, 18

5

*Sherbert v. Verner*,
 374 U.S. 398 (1963)................................................................................ 12

6

*Short v. Berger*,

7
 593 F. Supp. 3d 944 (C.D. Cal. 2022) ................................................... 4

8

*Siebert v. Gene Security Network, Inc.*,
 75 F. Supp. 3d 1108 (N.D. Cal. 2014) ................................................... 16

9

*Spivak v. City of Philadelphia*,

10
 649 F. Supp. 3d 45 (E.D. Pa. 2023) ....................................................... 11

11

*Stormans, Inc. v. Wiseman*
 794 F.3d 1064 (9th Cir. 2015) ................................................... 11, 12, 16

12

13
*Sullivan v. Dollar Tree Stores, Inc.*,
 623 F.3d 770 (9th Cir. 2010) ................................................................. 20

14

15
*Surrell v. California Water Service Co.*,
 518 F.3d 1097 (9th Cir. 2008) ............................................................... 16

16

*Tandon v. Newsom*,

17
 593 U.S. 61 (2021)........................................................................... 14, 17

18
*UnifySCC v. Cody*,
 Case No. 22-cv-01019, 2022 WL 2357068 (N.D. Cal. June 30, 2022).................... *passim*

19

*United States ex rel. Kelly v. Serco, Inc.*,

20
 846 F.3d 325 (9th Cir. 2017) ................................................................. 21

21
*We The Patriots USA, Inc. v. Hochul*,
 17 F.4th 266 (2d Cir. 2021) ....................................................... 11, 12, 17

22

*Whitlow v. California*,

23
 203 F. Supp. 3d 1079 (S.D. Cal. 2016)................................................... 8

24
*Wise v. Inslee*,
 No. 2:21-CV-0288, 2021 WL 4951571 (E.D. Wa. Oct. 25, 2021)................... 17

25

*Yates v. Ford Motor Co.*,

26
 No. 5:12-CV-752, 2015 WL 3448905 (E.D.N.C. May 29, 2015) ................... 16

27

28

1

## **TABLE OF AUTHORITIES**
Continued

2

3    *Zucht v. King*,
4         260 U.S. 174 (1922)....................................................................................... 8

5

6    <u>STATUTES</u>

7    California Government Code
          Section 12940(a)(1) ............................................................................... 25
8
     Public Utilities Code
9         Section 99171............................................................................................ 15

10

11   <u>RULES</u>

12   Federal Rules of Civil Procedure
13        Rule 56 ......................................................................................... 16, 24, 25

14   Federal Rule of Evidence
          Rule 201 ..................................................................................................... 2
15        Rule 702 .................................................................................................... 18
          Rule 802 .................................................................................................... 18
16        Rule 803 .................................................................................................... 19

17

18

19

20

21

22

23

24

25

26

27

28

BART'S OPP. TO MTN. FOR PARTIAL SUMM. JUDG.- Case No. 3:22-cv-09193-WHA

I.      **Introduction**

Defendant San Francisco Bay Area Rapid Transit District ("BART") opposes Plaintiffs'
Motion for Partial Summary Judgment.  This motion is largely a restatement of the partial
summary judgment motion filed by the plaintiffs in the companion *Chavez* case, No. 3:22-cv-
06119-WHA, which the Court is hearing on February 29, 2024.  All plaintiffs in these related
cases are represented by the same counsel.  In this rehash, Plaintiffs improperly attempts to
manipulate third-party evidence to strengthen their motion, and include very limited new
argument.  Those matters are addressed below.

As discussed in the *Chavez* briefing, BART's employee vaccine mandate did not violate
Plaintiffs' free exercise rights under the First and Fourteenth Amendments because the mandate,
including its religious exemption process, was neutral and generally applicable as a matter of
law.  Accordingly, the mandate is subject to rational basis review, which it clears easily.  In
addition, even were the vaccine mandate subject to strict scrutiny review, which it is not, it
would satisfy such review as a matter of law.  Not only must Plaintiffs' motion be denied with
respect to their Second Cause of Action, but BART is itself entitled to summary judgment on
that claim and has cross-moved by a filing concurrent with this opposition.

Plaintiffs' motion should also be denied with respect to their Title VII and FEHA claims.
As discussed below, BART would have suffered an undue burden or hardship if it had permitted
unvaccinated employees to continue to work.  Plaintiffs speak to those concerns only in terms of
the financial burden, which was important, but secondary.  BART's primary concerns were
employee health, public health, and ensuring a sufficient available workforce to continue its
essential operations.  Unvaccinated employees were a threat to those goals, and BART can
establish that continuing to employ them would have constituted an undue burden or hardship
under Title VII and FEHA.  Additionally, none of the plaintiffs here who were denied a religious
exemption by BART can establish that he or she was entitled to one as a matter of law.

///

///

///

1    **II.**      **Relevant Factual Background**

2        **A.**      **BART's Vaccine Mandate**

3            BART is a heavy rail service that provides public transportation throughout the Bay Area.

4    Declaration of Victoria R. Nuetzel in Support of Opposition to Plaintiffs' Motion for Summary

5    Judgment and in Support of Defendant's Motion for Partial Summary Judgment, Ex. A, *Chavez*

6    *v. BART*, No 3:22-cv-06119-WHA (N.D. Cal. Jan. 10, 2024), Dkt. 51-1 ("Nuetzel Decl.").[1]

7    Many people, including essential workers, relied on BART to commute to work and perform

8    essential life activities during the COVID-19 pandemic.  *Id.*  For this reason, BART employees,

9    along with other state and local transit personnel, were deemed essential workers.  Declaration of

10   Rodney Maplestone in Support of Opposition to Plaintiffs' Motion for Summary Judgment and

11   in Support of Defendant's Motion for Partial Summary Judgment at ¶ 4, *Chavez v. BART*,

12   No. 3:22-cv-06119-WHA (N.D. Cal. Jan. 10, 2024), Dkt. 51-2 ("Maplestone Decl."), ¶ 4.

13           To ensure BART continued to operate during this critical time, in October 2021, BART's

14   Board of Directors adopted a mandate that all employees must be vaccinated against COVID-19.

15   Nuetzel Decl., Ex. B.  The purpose of BART's vaccine mandate was to protect its employees and

16   the public and its capacity to fulfill its critical public mission.  *Id.*  In particular, BART sought to

17   prevent both its employees and the public from contracting COVID-19, and also to minimize the

18   severity of illness if its employees were infected, so as to reduce the period during which they

19   would be absent from work.  *Id.*

20           The mandate was prescient.  January 2022 saw a significant uptick in COVID-19

21   infections in California, with more than 50,000 new cases reported in the state every day that

22   month.  Johns Hopkins Univ. of Med., Coronavirus Resource Center, available at

23   https://coronavirus.jhu.edu/region/us/california[2]; *see also* Declaration of Joseph A. Lewnard,

24   Ph.D. in Opposition to Motion for Summary Judgment at ¶¶ 10-12, *Chavez v. BART*, No 3:22-

25   ───────────────

26           [1] Rather than file duplicative declarations, BART refers to the declarations filed in the
     related case.  These filings may be judicially noticed under Federal Rule of Evidence 201, and
27   BART requests that the Court do so.

28           [2]  These data may also be judicially noticed under Federal Rule of Evidence 201, and
     BART requests that the Court do so.

1   cv-06119-WHA (N.D. Cal. Jan. 10, 2024), Dkt 51-3 ("Lewnard Decl."). California saw an

2   average of more than 100 deaths per day from COVID-19 in January 2022, which continued

3   through March 2022. *Id.* Human nature may downplay the severity of past bad conditions, but

4   the Court will recall the seriousness of the situation. *See also* Lewnard Decl., ¶¶ 9-12.

5   **B.     BART's Consideration of Requests for Religious Exemption and
         Accommodation**

6

7       This lawsuit is brought by former BART employees in a variety of positions who refused

8   to be vaccinated against COVID-19. Each claimed that sincerely held religious belief prevented

9   their vaccination and sought an exemption from the vaccine mandate and accommodation that

10  would permit them to work unvaccinated.

11      BART anticipated such requests and specified that it would consider exemptions.

12  Nuetzel Decl., Ex. B. It developed an Employee Vaccination Policy, which specified the

13  potential exemptions and process for requesting them. Nuetzel Decl., Ex. C. BART modeled its

14  process on the Equal Employment Opportunity Commission's ("EEOC") existing guidance

15  concerning requests for religious exemption from COVID-19 vaccination requirements.

16  Maplestone Decl., ¶ 6. As recommended by the EEOC, BART's Leave Management

17  Department prepared forms to collect information from employees concerning the beliefs that

18  prevented them from being vaccinated and the accommodation sought. Maplestone Decl., ¶¶ 6-

19  7. Those forms permitted employees to explain their individual belief and objection to COVID-

20  19 vaccination. *Id.* If, following initial review, more information was required, an interview was

21  conducted. Maplestone Decl., ¶ 8. All interviews used the same questions to focus on the EEOC

22  criteria for determination of an employee's sincerely held religious belief. Maplestone Decl.,

23  ¶ 9.

24      When the information was complete, a panel of three BART employees reviewed each

25  application. Maplestone Decl., ¶ 10; Nuetzel Decl., Ex. D at 33:8-19; Ex. E at 10:17-11:20.

26  Each decision was individual to the employee, with each employee's stated religious beliefs

27  separately considered. Maplestone Decl., ¶ 10. Altogether, BART received requests for

28  religious exemption from 181 employees. Maplestone Decl., ¶ 14. Of these initial requests,

1   40 employees chose not to complete the application process, and either were vaccinated or had

2   their employment terminated.  *Id.*  Of those who completed the process, 70 were granted

3   religious exemption from the vaccine mandate.  *Id.*  Of those employees denied an exemption,

4   45 elected to be vaccinated rather than end their employment.  *Id.*

5           For each employee who received a religious exemption, BART considered whether a

6   reasonable accommodation could permit them to work unvaccinated while taking into account

7   the safety of the public and other employees.  Maplestone Decl., ¶ 16.  BART's analysis relied

8   on guidance from public health officials and agencies, and reflected the critical nature of

9   BART's service in the Bay Area.  *Id.*  There was no predetermined decision or instruction to

10  deny any accommodation.  Nuetzel Decl., Ex. D at 44:4-20; Ex. E at 12:25-13:5, 16:24 –17:4.

11  After such inquiries, BART was unable to accommodate any of the 70 employees who received

12  religious exemptions.  Maplestone Decl., ¶ 18.  BART could not identify accommodation that

13  would permit the employee to continue to work unvaccinated without imposing an undue burden,

14  namely health and safety concerns for the public and co-workers.  *Id.*

15          Of the 70 employees who were granted an exemption, but could not be accommodated,

16  33 chose to be vaccinated rather than separated from employment.  *Id.*, ¶ 19.  Thirty-seven

17  employees who were granted exemptions, but could not be accommodated, resigned, retired, or

18  were terminated.  *Id.*

19          Altogether, 73 employees who requested a religious exemption and completed the

20  application process lost their jobs.  Mapleston Decl., ¶ 19.  Thirty-six were denied an exemption;

21  37 received an exemption, but could not be accommodated.  *Id.*, ¶¶ 14, 19.  Following

22  completion of the exemption process, BART did not permit any unvaccinated employee to

23  work.[3]  *Id.*, ¶ 20.

24  _____

25          [3]   Plaintiffs plead that BART "granted medical accommodations to vaccination but not a
    single religious accommodation."  Dkt. 1, ¶ 51; *see also id.* at ¶¶ 59, 61, 66.  BART did grant
26  eight medical accommodations, but each of those required the employee to refrain from working
    until he or she could be vaccinated.  Maplestone Decl., ¶ 15.  During the period that medical
27  issues prevented vaccination, each employee was placed on unpaid leave.  *Id.*  After completion
    of the exemption process, BART did not permit <u>any</u> employee to work while unvaccinated for
28  any reason.  Maplestone Decl., ¶ 20; *see also Short v. Berger*, 593 F. Supp. 3d 944, 951 (C.D.
    Cal. 2022) ("[o]nly permanent medical exemptions are analogous to religious exemptions").

1      **C.      BART's Health and Safety Concerns Were Well Grounded**

2           BART supports this opposition with declarations from two expert witnesses, Joseph A.

3    Lewnard, Ph.D., an epidemiologist on faculty at the University of California, Berkeley, and

4    Nancy M. McClellan, an eminent industrial hygienist.  These experts establish that BART's

5    employee and public health concerns were valid, and that no lesser means existed to address

6    BART's concerns at the same level of efficacy.  BART will not repeat the declarations in this

7    brief, but some of the key points are as follows:

8        •   By October 2021, when BART's vaccine mandate went into effect, 85% of adults in

9            California had received a full primacy vaccine series against COVID-19.  Lewnard

10           Decl., ¶ 9.  By January 2022, when BART completed its exemption and

11           accommodation process, about 90% of adults in California were vaccinated.  *Id.*

12       •   Despite these levels of vaccination, the United States and California remained in an

13           acute phase of the COVID-19 pandemic.  Lewnard Decl., ¶ 10.  Weekly COVID-19

14           hospitalizations hit an all-time high of 150,652 during the week beginning

15           January 15, 2022.  *Id.*  Vaccination efforts are estimated to have prevented

16           72,000 COVID-19 hospital admissions and 19,000 deaths in California from

17           February through October 16, 2021.  *Id.*, ¶ 11.  From October 2021 through

18           February 2022, the percentage of the adult population of the U.S. who had

19           experienced COVID-19 infection rose from about 21% to 58%, demonstrating the

20           dramatic effect of the Omicron variant then circulating.  *Id.*

21       •   As of October 2021, "[r]educing the spread of SARS-CoV-2 remained a necessary

22           means of preventing individuals – whether employees or members of the public –

23           from experiencing severe disease (*e.g.*, necessitating hospital admission or intensive

24           care) or death from avoidable SARS-CoV-2 exposures occurring on BART's

25           premises."  Lewnard Decl., ¶ 13; *see also* Declaration of Nancy M. McClellan in

26           Opposition to Summary Judgment at ¶ 11, *Chavez v. BART*, No 3:22-cv-06119-WHA

27           (N.D. Cal. Jan. 10, 2024), Dkt 51-4 ("McClellan Decl.").

28    ///

- "The most straightforward means by which vaccination can contribute to this objective of reducing the spread of SARS-CoV-2 is by preventing infections from occurring, as individuals who are not infected cannot transmit to others." Lewnard Decl., ¶ 14. Randomized controlled trials at the time demonstrated that the available vaccines were about 94% and 95% efficacious. *Id.* "Federal OSHA declared that the vaccines authorized by the U.S. Food and Drug Administration in the United States were highly effective at protecting fully vaccinated people against symptomatic and severe COVID-10 health effects." McClellan Decl., ¶ 12.

- "[L]ittle to no evidence supported adoption of other countermeasures as suitable alternatives that would enable BART to achieve the same objective of reducing SARS-CoV-2 spread. . . ." Lewnard Decl., ¶ 16. "Best-available studies estimated that even when using polymerase chain reaction (PCR) tests with high frequency (every 2 days) and rapid results turnaround (1 day), only 58% (40% to 74%) of symptomatic cases could be identified before symptoms onset. . . ." *Id.* "Rapid antigen-based tests, which offer lower sensitivity for detection of SARS-CoV-2 infection, but enable faster identification of positive cases by delivering results almost instantly, were not yet widely and readily available to the U.S. general public as of October 2021, with many having received Emergency Use Authorization only months earlier and demand greatly outstripping available supply." *Id.* "[R]outine testing at a weekly frequency was estimated to reduce transmission by only 24% within the general population." *Id.* ¶ 17. "Broad scientific awareness of these findings as of October 2021, and appreciation of the clear difference in the effectiveness of testing relative to vaccination, supported BART's policy of requiring vaccination among employees rather than accepting testing as an alternative." *Id.*

- "Abundant studies" had shown by October 2021 that wearing gloves was not an effective strategy for avoiding COVID-19 infection. Lewnard Decl., ¶ 18. "Further non-pharmaceutical countermeasures such as mask-wearing, voluntary self-isolation after known or potential exposure to SARS-CoV-2 or based on presence of

1    symptoms, physical distancing, and enhanced ventilation or filtration of shared indoor

2    air continued to be recommended and practices as an adjunct strategy together with

3    vaccination.  These measures were thus sought to enhance protection beyond what

4    was afforded by BART's vaccination policy, they could not be expected to serve as

5    sufficient alternatives to vaccination." *Id.*  "While masking reduced transmission of

6    larger bioaerosols, the mask materials and fit to the face resulted in minimal

7    protection from smaller particle size and higher concentration bioaerosols, resulting

8    in the consideration of face masks as a far inferior control and interim measure

9    relative to vaccination."  McClellan Decl., ¶ 14; *see also id.*, ¶ 21 ("The risk of

10   bioaerosol exposure in the various transit workplace settings required a multilayer

11   control approach with vaccination as the highest priority within the layers of

12   engineering, administrative, and PPE controls.").

13   •    As of the relevant time period, October 2021 through January 2022, "there were no

14        less restrictive means for BART to achieve its goals of lessening the spread of

15        COVID-19 among employees and the general public, and of decreasing the severity

16        of symptoms and frequency of hospitalization, than vaccination.  All other measures

17        available were significantly inferior to vaccination with respect to achieving those

18        goals."  Lewnard Decl., ¶ 19; McClellan Decl., ¶ 22.

19   **III.   Argument**

20         **A.     BART's Religious Exemption Process Did Not Violate Plaintiffs'
21                  Rights of Free Exercise**

22         To comply with its obligations as an employer under Title VII and FEHA, BART was

23   required to consider exemptions and accommodation for employees who sincerely held a

24   religious belief that prevented their vaccination against COVID-19.  *Opuku-Boateng v. State of*

25   *Cal.*, 95 F.3d 1461, 1467 (9th Cir. 1996); *Cal. Fair Emp't & Hous. Comm'n v. Gemini Aluminum*

26   *Corp.*, 122 Cal. App. 4th 1004, 1011 (2004).  BART's process, which followed EEOC guidance

27   and applicable law, considered whether (1) the belief that prevented an employee's vaccination

28   was religious, rather than secular, and (2) the employee could perform their job duties while

1    unvaccinated without imposing undue hardship or significant difficulty on BART.[4]  (Maplestone

2    Decl., ¶ 12.)

3          Plaintiffs contend that BART's vaccine mandate was not "generally applicable" to its

4    workforce, and therefore should be subject to strict scrutiny review to determine whether

5    infringement on their free exercise rights was constitutional.  Dkt. 32 at 13-15.  That legal

6    assertion is mistaken and contrary to case law.  BART's religious exemption process was

7    generally applicable as a matter of law, and easily passes rational basis review.  Further, even

8    were strict scrutiny applicable, which it is not, BART's process would clear that hurdle as well.

9                   **1.      BART's Vaccine Mandate Was a Neutral Law of General
                            Applicability Subject to Rational Basis Review**
10

11         "Courts in this country have held for over a century that mandatory vaccination laws are

12   a valid exercise of a state's police powers, and such laws have withstood constitutional

13   challenges."  *Dr. T. v. Alexander-Scott*, 579 F. Supp. 3d 271, 280 (D. R.I. 2022) (citing

14   *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 889 (1990) ("*Smith*");

15   *Prince v. Massachusetts*, 321 U.S. 158, 166-67, n.12 (1944); *Zucht v. King*, 260 U.S. 174, 176-

16   77 (1922); *Jacobson v. Massachusetts*, 197 U.S. 11, 25-27 (1905)); *see also Whitlow v.*

17   *California*, 203 F. Supp. 3d 1079, 1086 (S.D. Cal. 2016) ("the right to free exercise does not

18   outweigh the State's interest in public health and safety").  Indeed, California's requirement that

19   children be vaccinated to attend schools includes <u>no process</u> for religious exemption and is

20   nonetheless constitutional.  *See Whitlow*, 203 F. Supp. 3d at 1085-86.

---

21        [4]   Of the moving Plaintiffs, six did not receive a religious exemption because BART
     determined that their stated reason for non-vaccination was secular rather than religious.
22   Maplestone Decl., ¶ 13.  To prevail on any of their claims, those six Plaintiffs must establish that
     a sincerely held religious belief prevented their vaccination.  *E.g.*, *Malik v. Brown*, 16 F.3d 330,
23   333 (9th Cir. 1994) (free exercise); *Opuku-Boateng*, 95 F.3d at 1467 (Title VII); *Cal. Fair Emp't
     & Hous. Comm'n v. Gemini Aluminum Corp.*, 122 Cal.App.4th at 1011 (FEHA).  Plaintiffs argue
24   that BART's accommodation process "examined whether a stated belief was religious enough to
     satisfy the interviewer."  Dkt. 32 at 23.  According to Plaintiffs, religion "cannot be put through a
25   crucible of state-determined objective criteria" *Id.*  This is not the law.  "Determining whether a
     [free exercise] claim is 'rooted in religious belief' *requires* analyzing whether the plaintiff's
26   claim is related to his sincerely held religious belief."  *Malik*, 16 F.3d at 333 (emphasis added).
     Accordingly, BART was required to consider whether the requests arose out of religious, or
27   secular belief.  *See, e.g., Fallon v. Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487,
     492–93 (3d Cir. 2017) ("[W]e are not the only court to come to the conclusion that certain anti-
28   vaccination beliefs are not religious.").

1  "The Supreme Court has held that 'the right of free exercise does not relieve an

2  individual of the obligation to comply with a 'valid and neutral law of general applicability on

3  the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or

4  proscribes)." *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177 (9th Cir. 2021) (quoting

5  *Smith*, 494 U.S. at 879). "[A] law that is neutral and of general applicability need not be justified

6  by a compelling governmental interest even if the law has the incidental effect of burdening a

7  particular religious practice . . . . A law failing to satisfy these requirements must be justified by

8  a compelling governmental interest and must be narrowly tailored to advance that interest."

9  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); *see also*

10 *Parents for Privacy v. Barr*, 949 F.3d 1210, 1238 (9th Cir. 2020) (laws that are generally

11 applicable and facially neutral are subject only to rational basis review).

12      Plaintiffs rely on the Supreme Court's decision in *Fulton v. City of Philadelphia*, 141 S.

13 Ct. 1868 (2021), to argue that BART's vaccine mandate was not generally applicable, and is thus

14 subject to strict scrutiny review, because it included an EEOC-based religious exemption process

15 to comply with Title VII and FEHA. Dkt. 32 at 13-15. According to Plaintiffs, a governmental

16 employer cannot comply with those statutes without running afoul of the First Amendment such

17 that its policies become subject to strict scrutiny review. As discussed here, Plaintiffs misread

18 *Fulton* and fail to address pertinent authority, including from the Ninth Circuit and this Court.

19          a.   ***Fulton* Did Not Hold that <u>Any</u> Individualized Consideration
20               Renders an Exemption Process Not Generally Applicable**

21      *Fulton* considered a decision by the City of Philadelphia to cease its long-term

22 relationship with Catholic Social Services ("CSS") to provide foster agency services. 141 S. Ct.

23 at 1874-76. The City did so citing to an ordinance that prohibited it from doing business with

24 any entity that discriminated against same-sex couples. *Id.* at 1875-76. CSS refused to consider

25 same-sex couples as foster parents, so the City ended its relationship. *Id.* CSS sued, claiming

26 that the City's decision violated its free exercise rights. *Id.* at 1876. The Supreme Court held

27 that the ordinance at issue was not generally applicable because it vested a City employee with

28 "sole" authority to grant "entirely discretionary exemptions" to the ordinance. *Id.* at 1878;

1    *see also id.* at 1877 ("A law is not generally applicable if it invites the government to consider

2    the particular reasons for a person's conduct by providing a mechanism for individualized

3    exemptions." (internal quotations omitted)).

4        As discussed below, *Fulton* did not hold that <u>any</u> consideration specific to one or more

5    persons renders a law or policy not "generally applicable."  Rather, a court must assess whether

6    an exemption process permits sufficiently <u>broad, unchecked discretion</u> that animus against an

7    applicant's religious belief jeopardizes impartial decision making.  Such was the case in *Fulton*,

8    where a City official empowered with "entirely discretionary" authority over the exemption told

9    CSS leadership that "things have changed since 100 years ago" and "it would be great if we

10   followed the teachings of Pope Francis, the voice of the Catholic Church."  *Id.* at 1875.  There is

11   no evidence of animus by any BART employee in this case, nor was any BART employee given

12   sole, unchecked discretion to exempt other employees from the vaccine mandate.  Instead, the

13   undisputed evidence establishes that the three-employee panel that considered requests applied a

14   uniform standard and procedure, consistent with EEOC guidelines.[5]  Maplestone Decl., ¶ 10.

15       This Court considered the application of *Fulton* to a governmental employer's COVID-

16   19 vaccine mandate in *UnifySCC v. Cody*, Case No. 22-cv-01019, 2022 WL 2357068 (N.D. Cal.

17   June 30, 2022), a case not cited in Plaintiffs' brief.  *UnifySCC* concerned Santa Clara County's

18   vaccine mandate, which included a religious exemption process; the plaintiffs brought a free

19   exercise challenge and made the same *Fulton* argument Plaintiffs make here.  *Id.* at *6-*12.  The

20   Court's discussion and application of applicable law provide a template for this case.[6]  *See also*

21   *George v. Grossmont Cuyamaca Cmty. Coll. Dist. Bd. of Governors*, Case No. 22-cv-0424,

22   2022 WL 16722357, at *12-15 (S.D. Cal. November 4, 2022) (following *UnifySCC* in

23   considering employee vaccination mandate).

24          [5]  Plaintiffs erect a straw man by mischaracterizing BART's argument, suggesting that
      BART distinguishes *Fulton* because its exemption decisions were made by a three-person panel,
25   rather than one employee.  Dkt. 32 at 24.  Not so.  *Fulton* is different because of the nature of
      BART's exemption analysis, not the number of employees who participated in it.
26

27          [6]  Plaintiffs argue that *UnifySCC* is distinguishable because Santa Clara County did "not
      exercise any discretion in granting a religious exemption once it determined that the exemption
      was sought for a religious reason."  Dkt. 32 at 17 (quoting *UnifySCC*, 2022 WL 2357068, at *8).
28   To the contrary, BART did the same.  *See* Maplestone Decl., ¶¶ 6-13.

1   "Under *Fulton*, law incidentally burdening religion is subject only to rational basis

2   review as long as it is neutral and generally applicable." *UnifySCC*, 2022 WL 2357068, at *6

3   (citing *Fulton*, 141 S. Ct. at 1976; *Lukumi*, 508 U.S. at 531-34). "A policy must be both facially

4   and operationally neutral to avoid strict scrutiny." *Id.* "The tests for 'neutrality and general

5   applicability are interrelated,' but the prongs are considered separately." *Id.* (quoting *Stormans*,

6   794 F.3d at 1076).

       **b.**     **BART's Vaccine Mandate Was Neutral**

8   "A law lacks facial neutrality if it refers to a religious practice without secular meaning

9   discernible from the language or context." *UnifySCC*, 2022 WL 2357068, at *6 (quoting

10  *Stormans, Inc. v. Wiseman*, 794 F.3d 1064, 1076 (9th Cir. 2015)). "COVID-19 vaccination

11  requirements have been found to be facially neutral when they apply to an entire category

12  (i.e., all employees) and 'do not single out employees who decline vaccination on religious

13  grounds.'" *Id.* (quoting *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021);

14  and citing *Kane v. De Blasio*, 19 F.4th 152, 164 (2d Cir. 2021)). "The existence of religious

15  exemptions does not undermine facial neutrality." *Id.* (citing *Kane*, 19 F.4th at 165).

16  BART's vaccine mandate was facially neutral because it applied to all employees and the

17  sole mention of religion was a process for an employee to apply for a religious exemption, which

18  was a potential benefit not available to employees with secular objections to vaccination. The

19  process was thus facially neutral with respect to free exercise. This Court reached that ruling

20  when considering a substantially similar mandate and exemption process in *UnifySCC*. 2022

21  WL 2357068, at *6. Other courts have ruled similarly with respect to similar COVID-19

22  employee vaccine mandates. *E.g.*, *We The Patriots USA, Inc.*, 17 F.4th at 281; *Spivak v. City of

23  Philadelphia*, 649 F. Supp. 3d 45, 55 (E.D. Pa. 2023); *Does 1-6 v. Mills*, 566 F. Supp. 3d 34, 46

24  (D. Me. 2021).

25  BART's vaccine mandate was also operationally neutral. It is an undisputed fact that

26  BART did not permit any employee to work while unvaccinated after requests for exemption

27  were fully processed. Maplestone Decl., ¶ 20. As this Court noted in *UnifySCC*, that result

28  applied "whether an employee [was] eager to be vaccinated or strongly opposed and whether an

1  employee's opposition or reluctance [was] due to philosophical or political objections to vaccine

2  requirements, concerns about the vaccine's efficacy or potential side effects, or religious

3  beliefs."[7]   2022 WL 2357068, at *6 (quoting *We The Patriots USA, Inc.*, 17 F.4th at 266.)

4  BART's inclusion of a religious exemption application process "*benefits* religious objectors and

5  does not undermine operational neutrality." *Id.* (emphasis in original).

6             **c.    BART's Vaccine Mandate Was Generally Applicable**

7             "A government policy will fail the general applicability requirement if it 'prohibits

8  religious conduct while permitting secular conduct that undermines the government's asserted

9  interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'"

10  *UnifySCC*, 2022 WL 2357068 at *7 (quoting *Kennedy v. Bremerton Sch. Dist.* __ U.S. __,

11  __ S. Ct. __, 2022 WL 2295034, at *9 (U.S. Jun. 27, 2022)).  "The mere existence of an

12  exemption that affords some minimal government discretion does not destroy a law's 'general

13  applicability.'"  *Id.*, at *7 (quoting *Stormans*, 794 F.3d at 1082); accord *Pilz v. Inslee*, No. 3:21-

14  cv-05735, 2022 WL 1719172, at *4 (W.D. Wash. May 27, 2022) (*Fulton* "did not hold that any

15  law containing exemptions is *per se* not generally applicable").  Rather, *Fulton* applies to an

16  exemption process that grants broad, unchecked discretion to a government official, because the

17  exercise of such discretion renders the process not generally applicable and vulnerable to anti-

18  religious bias.[8] *Id.* ("there must be some showing that the exemption procedures allow securally

19  motivated conduct to be favored over religiously motivated conduct" (quoting *Kane*, 19 F.4th at

20  165)).

21             The Ninth Circuit discussed an employee religious exemption process in *Doe v.*

22  *San Diego Unified School District*, 19 F.4th 1173 (9th Cir. 2021).  That case concerned a

23  COVID-19 vaccine mandate for students, and the plaintiff pointed to an exemption process in the

---

24      [7]   BART granted a small number of employees medical exemptions to the vaccine mandate,
but the sole accommodation was being placed on unpaid leave until the employee was medically

25  cleared to be vaccinated.  Maplestone Decl., ¶ 15.  There was no similar basis for unpaid leave
with respect to religious objectors because, unlike a transient medical condition, their religious

26  belief would not be anticipated to change and permit vaccination.

27      [8]   This standard is consistent with Plaintiffs' citation of *Sherbert v. Verner*, 374 U.S. 398
(1963).  Dkt. 32 at 14.  That case concerned a "good cause" standard for exemption, which is the

28  sort of broad, undefined discretion that was of concern in *Fulton*.  *See Sherbert*, 374 U.S. at 401.

1   school district's employee mandate as evidence that the student mandate was not generally

2   applicable. *Id.* at 1180. The Ninth Circuit explained that the employee process was not properly

3   considered a religious exemption:

4       [T]hat procedure does not apply to students and, in any event, is not a religious
        *exemption*. To the contrary, it is a legally required interactive process that may
5       ultimately result in a denial of the requested accommodation. The EEOC has
        released guidance that, although Title VII prohibits employment discrimination
6       based on religion, an employee's request for an exemption from a COVID-19
        vaccination mandate can be denied on the ground that the employee's belief is not
7       truly religious in nature or is not sincerely held, or on the ground that such an
        exemption would pose an "undue hardship" by burdening "the conduct of the
8       employer's business" through increasing "the risk of the spread of COVID-19 to
        other employees or the public."

9

10  *Id.* at 1180 (emphasis original). The Ninth Circuit thus recognized that when a governmental

11  employer, like BART, complies with Title VII and state law against discrimination by providing

12  a process to consider religious exemption and accommodation, it does <u>not</u> act in a discretionary

13  manner that renders its process not "generally applicable."[9]  *See also Pilz*, 2022 WL 1719172, at

14  *4-5 (law requiring all State of Washington employees to be vaccinated against COVID-19 was

15  generally applicable notwithstanding "standardized exemptions" because those were "not the

16  same as giving governmental officials wide latitude to deny exemptions for any reason").

17      It is thus settled law that providing a religious exemption process, which necessarily

18  includes consideration of an employee's personal belief and job duties, doesn't render a vaccine

19  mandate not generally applicable. Plaintiffs instead must establish "that the exemption

20  procedures allow secularly motivated conduct to be favored over religiously motivated conduct."

21  *UnifySCC*, 2022 WL 2357068, at *7 (quoting *Kane*, 19 F.4th at 165).

22      Plaintiffs argue that BART favored secular conduct because its vaccine mandate applied

23  only to its employees, and BART did not require that members of the public show proof of

24      [9]  Plaintiffs selectively quote deposition testimony from one BART witness, who agreed
        that "an individualized religious exemption" was part of BART's process and that BART's
25      review panel had "discretion on a case-by-case basis to determine whether to grant a religious
        exemption for a given employee." Dkt. 32 at 14. That testimony was consistent with BART's
26      explication here. The process was individual to the extent that the panel considered whether an
        applicant's stated belief was religious, rather than secular. Maplestone Decl. ¶¶ 6-13. The
27      panel's "discretion" was limited to making that determination. *Id.* As discussed, such a limited
        assessment of an exemption request, which was necessary to apply the governing legal standard,
28      does not render an exemption process not generally applicable.

1   vaccination before entering its system.  Dkt. 32 at 15.  This argument is unavailing – BART

2   treated similarly situated persons in the same manner, which is all the law requires.

3       Some unvaccinated members of the public who entered BART's system and rode its

4   trains undoubtedly refrained from vaccination for religious reasons, like the Plaintiffs.  BART

5   extended its public transit services to those people in the same manner it did to all members of

6   the public.  In fulfilling its mission as a public transit provider, BART did not distinguish

7   between those customers who avoided COVID-19 vaccination for religious reasons and any

8   other person.  With respect to riders, BART did not favor secularly motivated conduct over

9   religiously motivated conduct.

10      But transit riders and transit workers are not comparably situated.  The Second Circuit

11  considered, and rejected, an argument similar to Plaintiffs' in *Kane*, 19 F.4th at 165-66.[10]

12  *Kane* concerned New York City's COVID-19 vaccine mandate for employees working in public

13  schools.  *Id.* at 158.  The plaintiffs brought a free exercise challenge and argued that the City's

14  mandate was not generally applicable because it did not apply to members of the general public.

15  *Id.* at 165-66.  New York City's mandate permitted "students, parents (in certain circumstances),

16  deliverymen, repairmen, emergency responders" and others to enter schools without proof of

17  vaccination.  *Id.* at 161-62.  The *Kane* plaintiffs argued that the mandate thus favored secular

18  over religious conduct.  *Id.*  The Second Circuit disagreed, holding that because the mandate

19  "provides for objectively defined categories of exemptions … that do not 'invite the government

20  to decide which reasons for not complying with the policy are worthy of solicitude.'"  *Id.* at 166

21  (quoting *Fulton*, 141 S. Ct. at 1879).  The Second Circuit further held that the public's activities

22  were not comparable the employees' for purposes of a free exercise analysis:

23          "Whether two activities are comparable for purposes of the Free Exercise Clause
            must be judged against the asserted government interest that justifies the
24          regulation at issue."  [*Tandon v. Newsom*, __ U.S. __, 141 S. Ct. 1294, 1296, 209
            L.Ed.2dd 355 (2021).]  Plaintiffs argue that the Vaccine Mandate violates these
25          principles because it exempts certain groups of people (for example, emergency
            providers).  But that argument is unavailing.  Viewed through the lens of the
26          City's asserted interest in stemming the spread of COVID-19, these groups are
            not comparable to the categories of people that the Mandate embraces.  While the
27          exempt groups do not come into prolonged daily contact with large groups of

28      _____

        [10]   BART cited *Kane* in the *Chavez* briefing, but Plaintiffs fail to address this authority.

1   students (most of whom are unvaccinated), the covered groups (for example,
2   teachers) inevitably do.

3   *Id.*

4          The same is true for BART.  The interests behind BART's vaccine mandate were

5   threefold – (1) avoid the spread of infection among its workforce, (2) reduce downtime for

6   members of its workforce who became infected, and (3) reduce the spread of infection among the

7   public.  Nuetzel Decl., Ex. B.  Employees and the public were not evenly situated with respect to

8   these interests.  *See* McClellan Decl., ¶¶ 16-18, 20 ("The risk level is much lower for customers

9   and former employees spending minutes in transit environment compared to current BART

10  employees spending many working hours in the sometimes high-risk environment of the transit

11  system due to the differing duration and resulting likelihood of exposure.").  Requiring employee

12  vaccination was the best measure available to address the downtime concern, whereas requiring

13  public vaccination would not affect that concern.  *Id.*  Also, as with the teachers in *Kane*, many

14  BART employees were in regular contact with large groups of people, some unvaccinated, due to

15  the nature of their work.  *Id.*  Accordingly, the general public was not comparable to BART's

16  employees for purposes of implementing BART's vaccine mandate in furtherance of its public

17  health and operational interests.[11]

18         Without presenting any expert evidence, Plaintiffs argue that because "the Cooper-

19  Plaintiffs typically rode the trains for no longer than general public passengers" that "an

20  unvaccinated passenger on a train or at a station poses an identical health and safety risk as an

21  unvaccinated employee."  Dkt. 32 at 15.  This neglects the record.  BART's transit system is not

22  just its trains, but also encompasses its stations, offices, maintenance facilities, and other work

---

23  [11]   Plaintiffs assume, but do not establish, that BART had authority to impose a vaccine
    mandate on its patrons.  BART is a public transit district, and has limited authority to exclude
24  members of the public.  Public Utilities Code section 99171 governs prohibition orders by which
    a California transit district may bar a member of the public from its facilities.  None of the bases
25  stated pertains to a refusal to be vaccinated against contagious disease.  This is not to say that it
    would be impossible for the State to bar unvaccinated persons from using public transit, but
26  Plaintiffs' assertion that BART could do so on its own is both unsupported and not practicable.
    In addition, BART did not have sufficient personnel resources to confirm vaccination at the
27  points of entry to its stations.  Maplestone Decl., ¶ 21.  As the Court knows, BART's facilities
    are entered through automated fare gates, and BART does not employ ticket takers or other
28  employees who could be stationed at entry points to check proof of vaccination.  *Id.*

1    locations.  BART's employees do spend prolonged periods in those locations.  BART employees

2    need to access areas that riders cannot, further demonstrating how BART employees are not

3    comparably situated with members of the public.  *See* McClellan Decl., ¶¶ 16-18, 20.

4         No admissible evidence supports Plaintiffs' claim.  The question of whether BART's

5    patrons and employees are comparable with respect to its goals of preventing the spread of

6    COVID-19 and ensuring a sufficient workforce is a scientific one, involving questions of

7    industrial hygiene and public health that are beyond lay understanding.  Such scientific questions

8    must be addressed through expert witness testimony. *Claar v. Burlington N. R.R.*, 29 F.3d 499,

9    504 (9th Cir. 1994) (granting summary judgment because plaintiff failed to proffer expert

10   testimony necessary to adduce causation); *see also Yates v. Ford Motor Co.*, No. 5:12-CV-752,

11   2015 WL 3448905, at *9 (E.D.N.C. May 29, 2015) ("the fields of public health and industrial

12   hygiene will employ scientific, technical, or other specialized knowledge and are therefore a

13   proper subject for expert testimony" (internal quotations omitted)).  Here, Plaintiffs only support

14   their claim with lay witness testimony and attorney argument.  Neither are sufficient to prove a

15   dispute of material fact let alone establish a lack of dispute in Plaintiffs' favor.  *Orr v. Bank of*

16   *Am.*, 285 F.3d 764, 772 (9th Cir. 2002) ("A trial court can only consider admissible evidence in

17   ruling on a motion for summary judgment." (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman*

18   *Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)); *see also Surrell v. Cal. Water Serv. Co.*,

19   518 F.3d 1097, 1103 (9th Cir. 2008) ("Conclusory statements without factual support are

20   insufficient to defeat a motion for summary judgment."); *Siebert v. Gene Sec. Network, Inc.*, 75

21   F. Supp. 3d 1108, 1116 (N.D. Cal. 2014) ("Unsupported conjecture or conclusory statements []

22   do not create a genuine dispute of material fact and will not defeat summary judgment.").

23        **2.      BART's Vaccine Mandate Satisfies Rational Basis Review**

24        "Under rational basis review, [a court] must uphold the rules if they are rationally related

25   to a legitimate government purpose." *UnifySCC*, 2022 WL 2357068, at *8 (quoting *Stormans*,

26   794 F.3d at 1084).  "[T]he Supreme Court has held that '[s]temming the spread of COVID-19 is

27   unquestionably a compelling interest,' rather than merely a legitimate one." *Id.* (quoting *Roman*

28   *Catholic Diocese of Brooklyn v. Cuomo*, __ U.S. __, 141 S. Ct. 63, 67 (2020)); *see also* Dkt. 32

1   at 16 ("The Cooper-Plaintiffs concede, for purposes of this motion, that stemming the spread of

2   COVID-19 comprises a compelling state interest.").  "[A]s numerous courts have held, requiring

3   employees to be vaccinated is rationally related to that interest because data show that approved

4   COVID-19 vaccines drastically reduce the chances of contracting and spreading the virus, or of

5   being afflicted with serious illness or death from COVID-19 if the virus is contracted."

6   *UnifySCC*, 2022 WL 2357068, at *8 (citing *Does 1-6 v. Mills*, 566 F. Supp. 3d 34, 52 (D. Me.

7   2021); *We The People, Inc.*, 17 F.4th at 290; *Wise v. Inslee*, No. 2:21-CV-0288, 2021 WL

8   4951571, at *3 (E.D. Wa. Oct. 25, 2021)).  The undisputed evidence in this case is in accord—it

9   establishes that vaccination was by far the most effective tool available to BART, with no

10  comparable alternative.  Lewnard Decl., ¶¶ 13-19; McClellan Decl., ¶¶ 11-22.  There is no

11  reasonable argument that BART's vaccine mandate does not satisfy rational basis review, and

12  Plaintiffs do not contend otherwise.

13          **3.      BART's Vaccine Mandate Would Satisfy Strict Scrutiny
                       Review, Were It Appropriate**
14

15          Because BART's employee vaccine mandate was neutral and generally applicable, it is

16  not subject to strict scrutiny review, even if Plaintiffs' rights of free exercise were impacted.

17  *Lukumi*, 508 U.S. at 531-32; *Parents for Privacy*, 949 F.3d at 1238.  But if strict scrutiny were

18  applicable, the mandate still would be constitutional as a matter of law.

19          To satisfy strict scrutiny, the vaccine mandate must have been "justified by a compelling

20  state interest" and "narrowly tailored in pursuit of that interest."  *UnifySCC*, 2022 WL 2357068,

21  at *8 (quoting *Kennedy*, 2022 WL 2295034, at *9).  As discussed, the Supreme Court has held

22  that lessening the spread of COVID-19 was a compelling state interest and Plaintiffs concede as

23  much, so the only question is whether BART's vaccine mandate was narrowly tailored.  The

24  Supreme Court articulated the standard for considering whether a COVID-19 mandate is

25  narrowly tailored:  "[N]arrow tailoring requires the government to show that measures less

26  restrictive of the First Amendment activity could not address its interest in reducing the spread of

27  COVID."  *Tandon v. Newsom*, 593 U.S. 61, 63 (2021).  As discussed here, BART's employee

28  vaccine mandate satisfies that standard.

1    With this opposition, BART submits declarations from an expert epidemiologist,

2  Dr. Joseph Lewnard, and an expert industrial hygienist, Nancy McClellan, who each opine that

3  no less restrictive means existed to satisfy BART's goals of restricting the spread of COVID-19

4  among its workers, minimizing employee downtime in the event of infections, and restricting the

5  spread of the virus among the public.  Lewnard Decl., ¶ 19; McClellan Decl., ¶ 22.  Plaintiffs

6  present no expert evidence with their motion, only unsupported arguments, so BART's scientific

7  evidence stands unrebutted.  Given that this dispute concerns epidemiology, industrial hygiene,

8  and public health – all areas beyond the understanding of lay people – expert testimony is

9  necessary to establish a triable issue.[12]  *See* Fed. R. Evid. 702.

10    Rather than support their motion with expert evidence, Plaintiffs instead argue that

11  BART's policy could have been more narrowly tailored because a few other governmental

12  employers with COVID-19 vaccine mandates granted religious exemptions and accommodations

13  to their employees.  Dkt. 32 at 19-20.  Plaintiffs obtained this evidence through public records

14  requests, and it is all hearsay.  *See* Fed. R. Evid. 801, 802.  The evidence thus cannot be

15  considered on this motion unless a hearsay exception renders it admissible.  *E.g.*, *Orr v. Bank of*

16  *America, NT & SA*, 285 F.3d 764, 773 ("A trial court can only consider admissible evidence in

17  ruling on a motion for summary judgment.").

18  ///

19  ///

20

21    [12]   Without expert evidence to offer, Plaintiffs argue that with respect to free exercise,
"the Supreme Court will no longer allow experts to dictate the analysis."  Dkt. 32 at 19 n.13.

22  That is a remarkable assertion, without any substantial basis.  Plaintiffs rely on a quotation from
*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. __, 141 S.Ct. 63 (2020).  By that

23  decision, the Supreme Court granted injunctive relief to plaintiffs challenging state executive
orders that prohibited more than 10 or 25 persons from gathering for religious service.  141 S.Ct.

24  at 65-66.  The opinion includes the sentences quoted by Plaintiffs:  "Members of this Court are
not public health experts, and we should respect the judgment of those with special expertise and

25  responsibility in this area.  But even in a pandemic, the Constitution cannot be put away and
forgotten."  *Id.* at 68.  But immediately before, the Court noted that "the State has not claimed

26  that attendance at the applicants' services has resulted in the spread of the disease" and "has not
shown that public health would be imperiled in less restrictive means were imposed."  *Id.*  The

27  Court in *Roman Catholic* thus did not ignore proffered expert testimony, it merely declined to
defer to the judgment of state officials in the absence of expert testimony.  The circumstances

28  here are entirely different because BART's opposition is supported by admissible expert
declarations.

1      Public records are admissible under Federal Rule of Evidence 803(8), but not if

2  "circumstances indicate a lack of trustworthiness."  As the Court knows, there is a distinction

3  between granting an employee a religious exemption (*i.e.*, recognizing that the employee's

4  religious belief prevents compliance with a vaccine mandate) and providing an accommodation

5  (*i.e.*, permitting continued employment while unvaccinated).  Here, the proffered records

6  disclose on their face reason for concern that the personnel responding to Plaintiffs' public

7  records requests did not appreciate that important distinction.

8      The problem is demonstrated by the response from the City of San Jose, which Plaintiffs

9  included in the related case but is conspicuously omitted here.  *Compare* Declaration of Kevin T.

10  Snider at Ex. 8, *Chavez v. BART*, No 3:22-cv-06119-WHA (N.D. Cal. Dec. 12, 2023), Dkt. 46-2

11  ("Snider Chavez Declaration"), *with* Dkt. 32-2 ¶¶ 6-8.  Plaintiffs asked for information

12  concerning (1) the number of employees who requested a religious exemption and (2) the

13  number of employees who were granted a "religious accommodation."  Snider Chavez

14  Declaration, Ex. 8.  The City responded that "we received 379 religious exemption requests from

15  employees and approved 331."  *Id.*  The City thus told Plaintiffs how many <u>exemptions</u> were

16  granted, but not how many exempt employees received an <u>accommodation</u>.  *Id.*

17      Even Plaintiffs confused this critical distinction in the related case, mistakenly telling the

18  Court that "Three hundred and seventy-nine employees of the City of San Jose requested

19  accommodation, for which 331 were granted."  Chavez-Plaintiffs' Motion for Partial Summary

20  Judgment at 20, *Chavez v. BART*, No 3:22-cv-06119-WHA, (N.D. Cal. Dec. 12, 2023), Dkt. 46.

21  That is not correct.  The City reported that it approved 331 "religious <u>exemption</u> requests."

22  Snider Chavez Declaration, Ex. 8.  The City did not provide any information about how many

23  employees who received an exemption were then provided an <u>accommodation</u> that permitted

24  continued employment while unvaccinated.

25      The City of San Jose personnel did not correctly answer the questions that Plaintiffs

26  asked, perhaps because they did not appreciate the distinction between granting a religious

27  exemption and providing an accommodation.  That confusion indicates the information provided

28  by <u>all</u> the public agencies in response to identical requests lacks trustworthiness.  Other agencies

1    could have made a similar mistake and reported exemptions, rather than accommodations, not

2    appreciating the difference.  Plaintiffs attempt to hide unfavorable evidence from the Court by

3    excluding data from the City of San Jose from this motion after BART identified the problems it

4    presents in the *Chavez* briefing.  Indeed, that improper tactic raises the question of what other

5    public agency data Plaintiffs obtained, but did not file.  Plaintiffs have now shown themselves

6    willing to cherry-pick evidence, rather than present a complete picture.

7        *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770 (9th Cir. 2010), provides an example of

8    a government record excluded as hearsay because it was untrustworthy.  That case concerned a

9    Department of Labor report.  *Id.* at 778.  The Ninth Circuit held that the document was properly

10   outside the public records exception to the hearsay rule because, among other reasons, the author

11   was not identified and the report was sent in response to a FOIA request, rather than in the usual

12   course of business.  *Id.*  As the Court noted, if the author is unknown, it becomes "impossible to

13   assess the author's skill or experience."  *Id.*

14       Here, we have no insight into the person or persons who were the source of the data

15   provided to Plaintiffs, so the Court cannot assess whether they reliably understood the difference

16   between granting a religious exemption to a COVID-19 vaccination mandate, on one hand, and

17   providing an accommodation, on the other.  We know that the City of San Jose did <u>not</u> apply that

18   distinction.  Accordingly, the data from other public agencies is not sufficiently reliable to be

19   admissible as a public record.  If Plaintiffs sought to present <u>admissible</u> evidence concerning the

20   rate of accommodation for other governmental employers, they should have obtained that

21   information through deposition, where the reliability of the data could be established.

22       Even were the evidence from other public agencies admissible, Plaintiffs' approach is

23   facile because they present <u>no evidence</u> concerning any of those employees' job duties, the

24   conditions in their workplaces, or what accommodations were provided.[13]  Without such

---

25   [13]   The sole exception with respect to accommodation was the California Department of
26   Industrial Relations ("DIR"), which apparently permitted weekly or bi-weekly testing for
     employees who did not present proof of vaccination.  Dkt. 32 at 20, Dkt. 32-2, Ex. 6.  BART's
27   experts explain that such testing was not as effective in slowing the spread of COVID-19 as was
     vaccination.  Lewnard Decl., ¶¶ 16-17, 22; McClellan Decl., ¶ 19, 21-22.  It is an open question
28   why DIR adopted a less effective approach, but this single example does nothing to establish that
     BART's policy was not narrowly tailored.

1  evidence, there can be no assessment whether employees who received accommodation were

2  similarly situated to Plaintiffs.  Indeed, Plaintiffs' proffered evidence proves too much because,

3  with one exception, the other governmental employers denied accommodation requests for some

4  employees.  Dkt. 32-2, Ex. 7 (Contra Costa County denied 12 accommodation requests,

5  Santa Clara County denied 72 accommodation requests, Solano County denied 4 accommodation

6  requests).  Those employers determined that no reasonable accommodation was available for

7  some employees, which is the same conclusion that BART reached.  This data does nothing to

8  establish that BART could have employed less restrictive measures to accomplish its goals of

9  protecting employee and public health.

10       In addition, Plaintiffs' proffered "evidence" is woefully incomplete.  BART operates in

11  five counties, but Plaintiffs have provided data with respect to just two, excluding Alameda,

12  San Francisco, and San Mateo.  Cherry-picked data does not establish that BART's exemption

13  policy was not narrowly tailored.

14       With this opposition, BART submits unrebutted expert evidence that its COVID-19

15  vaccination mandate and religious exemption process were narrowly tailored because there were

16  no less restrictive means available to accomplish BART's goals with respect to employee and

17  public health.  Lewnard Decl., ¶ 19; McClellan Decl., ¶ 22.  Plaintiffs have not only failed to

18  meet their moving burden, but failed to submit sufficient evidence to establish a triable dispute of

19  material fact, as addressed in BART's cross-motion for summary judgment.  *United States ex rel.*

20  *Kelly v. Serco, Inc.*, 846 F.3d 325, 329-30 (9th Cir. 2017) (evidence that is "merely colorable, or

21  is not significantly probative" does not suffice to establish triable issue of material fact).

22       **B.       Plaintiffs Are Not Entitled to Summary Judgment on Their Title VII Claims**

23       Plaintiffs' Title VII claims require a two-part analysis:

24       We assess Title VII religious discrimination claims using a two-part analysis.
         First, the employee must establish a prima facie case of religious discrimination.

25       Second, if the employee does so, the burden shifts to the employer to show that it
         negotiated with the employee in an effort reasonably to accommodate the

26       employee's religious beliefs.  Where the negotiations do not produce a proposal
         by the employer that would eliminate the religious conflict, the employer must

27       either accept the employee's proposal or demonstrate that it would cause undue
         hardship were it to do so.  Only if the employer can show that no accommodation

28

1    would be possible without undue hardship is it excused from taking the necessary
2    steps to accommodate the employee's religious beliefs.

3    *Opuku-Boateng v. State of Cal.*, 95 F.3d 1461, 1467 (9th Cir. 1996) (internal quotation and

4    citations omitted).  To establish a prima facie case of religious discrimination, a plaintiff must

5    prove "that (1) he had a bona fide religious belief, the practice of which conflicted with an

6    employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer

7    threatened him with or subjected him to discriminatory treatment, including discharge, because

8    of his inability to fulfill the job requirements."  *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th

9    Cir. 1993).

10          For the purposes of this motion, BART does not dispute that Plaintiffs who were granted

11   an exemption to the vaccine mandate present sufficient evidence to establish their prima facie

12   case.  Those Plaintiffs are not entitled to summary judgment, however, because triable issues

13   exist concerning whether accommodation of Plaintiffs' working while unvaccinated would have

14   imposed an "undue hardship" on BART.[14]

15          Plaintiffs are correct that the Supreme Court clarified the meaning of "undue burden" last

16   year in *Groff v. DeJoy*, 600 U.S. 447, 468 (2023), when it overruled circuit law that the standard

17   was satisfied by anything "more than a *de minimis* cost" and instead held that "'undue hardship'

18   is shown when a burden is substantial in the overall context of an employer's business."

19   Plaintiffs contend that BART's accommodation analysis was fatally flawed because it relied on

20   pre-*Groff* precedent and used "the wrong legal standard."  Dkt. 32 at 28.  Not so.

21          It is not, and has never been, BART's position that Plaintiffs could not be accommodated

22   because doing so would impose an expense that is just "more than a *de minimis* cost."  The

23   primary focus of BART's accommodation inquiry was not expense, but employee and public

24   ///

25

26   [14] As noted, *supra* at fn. 4, the Plaintiffs who were denied an exemption would have to
     establish all elements of a prima facie case.  Plaintiffs fail to establish those matters in their
27   motion.  Even could those Plaintiffs establish a prima facie case, their claims would not be
     proper for summary judgment for the reasons stated here concerning undue burden of
28   accommodation.

1   health.  BART can, and at trial will[15], establish that Plaintiffs could not be accommodated to

2   work while unvaccinated without imposing a substantial burden on BART's operations,

3   employees, and patrons due to the increased risk of unvaccinated employees becoming infected

4   with COVID-19, increased risk of unvaccinated employees infecting others with COVID-19, and

5   increased risk that unvaccinated employees infected with COVID-19 would experience severe

6   illness, thereby increasing their time away from work.  Lewnard Decl., ¶¶ 9-19; McClellan Decl.,

7   ¶¶ 11-22.  Such evidence establishes that accommodating unvaccinated employees would have

8   imposed an undue hardship on BART.

9          The Central District of California undertook this analysis in *Bordeaux v. Lions Gate*

10  *Entertainment, Inc.*, No. 2:22-cv-04244, 2023 WL 8108655 (C.D. Cal. Nov. 21, 2023), a case

11  decided after *Groff*.  The plaintiff in *Bordeaux* was an actor terminated when she refused to

12  comply with her employer's vaccine mandate; she sued for religious discrimination under Title

13  VII.  *Id.* at *1.  The court relied on Ninth Circuit precedent that "an employer may also show

14  hardship on the plaintiff's coworkers."  *Id.* at *13 (quoting *Opuku-Boateng*, 95 F.3d at 1468).

15  The court found that the employer had established undue burden:  "Accommodating Plaintiff's

16  exemption request would have put the lives of her fellow cast and crew members in danger.

17  Around the time that RTW Season 2 was filming, roughly 2,000 deaths per day were attributable

18  to COVID-19.[16]  [citation]  In and of itself, this safety risk constitutes an undue hardship."  *Id.*

19  *Bordeaux* cited other courts also holding that an employee who refused to be vaccinated against

20  COVID-19 posed a health and safety risk to co-workers.  *Id.* (citing *Kushner v. N.Y.C. Dep't of*

21  *Educ.*, No. 22-cv-5265, 2023 WL 6214236, at *5  (E.D.N.Y. Sept. 25, 2023) ("It is beyond cavil

22  that safety within any work environment . . . is of absolute importance . . . .  [C]reating a health

23  and safety risk that would have prevented the DOE from fostering a safe educational and work

24  environment . . . alone would have established undue hardship . . . ."); *Dennison v. Bon Secours*

25  _____

26       [15]   Plaintiffs refer to a jury trial.  Dkt. 32 at 25.  Plaintiffs, however, have waived jury trial
     of this suit.

27       [16]   The plaintiff in *Bordeaux* was terminated in January 2022, 2023 WL 8108655, at *4, the
     same time period during which BART considered and denied exemptions and/or accommodation
28   to the Plaintiffs.

1   *Charity Health Sys. Med. Grp., P.C.*, No. 22-CV-2929, 2023 WL 3467143, at *6 n.7 (S.D.N.Y.

2   May 15, 2023) ("[T]here is also the obvious hardship associated with the increased health and

3   safety risk posed to other employees and patients by allowing Plaintiffs to remain unvaccinated

4   while working at their respective facilities . . . .")). *Bordeaux* noted that "[n]umerous courts have

5   found the possibility of an unvaccinated individual getting sick to be a non-speculative risk that a

6   court may consider when performing an undue hardship analysis." *Id.* at *14 (citing *Aukamp-*

7   *Corcoran v. Lancaster Gen. Hosp.*, No. 19-5734, 2022 WL 507479, at *6 (E.D. Pa. Feb. 18,

8   2022); *Robinson v. Children's Hosp. Boston*, No. 14-10263, 2016 WL 1337255, at *9 (D. Mass.

9   Apr. 5, 2016); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1309-10 (D. Haw.

10  2022); *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1109 (D. Colo. 2021)).

11          With this opposition, BART submits unrebutted expert evidence that unvaccinated

12  workers posed substantial health and safety risks for its other employees and its patrons.

13  Lewnard Decl., ¶¶ 9-19; McClellan Decl., ¶¶ 11-22.  Unvaccinated workers were more likely to

14  contract COVID-19 and infect others.  Lewnard Decl., ¶¶ 14-15.  Unvaccinated workers were

15  also more likely to develop serious illness, leading to extended absences from work. *Id.*, ¶ 13;

16  *see also Bordeaux*, 2023 WL 8108655, at *13 (being forced to replace employees who become

17  incapacitated due to illness imposes an undue burden on employer).  The evidence before the

18  Court established that a triable issue exists concerning whether accommodating Plaintiffs by

19  permitting them to work while unvaccinated – including with any of the available mitigation

20  tools available at the time – would have imposed an undue burden on BART.  Summary

21  judgment, therefore, may not be granted. Fed. R. Civ. Proc. 56(a); *Celotex v. Catrett*, 477 U.S.

22  317, 324 (1986) (summary judgment may not be entered if nonmoving party supplies sufficient

23  evidence to establish genuine dispute as to material fact on which it has the burden of proof).

24          **C.      Plaintiffs Are Not Entitled to Summary Judgment on Their FEHA Claims**

25          Plaintiffs' effort to suggest that California's Fair Employment and Housing Act

26  ("FEHA") imposes "a more stringent standard" that Title VII is incorrect. *See* Dkt. 32 at 29.

27  Just last year the Ninth Circuit explained that "[b]oth statutes require employers to accommodate

28  job applicants' [or employees'] religious beliefs unless doing so would impose an undue

1    hardship." *Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023).

2    There is no material difference in the burdens of proof under these statutes. *Id.*

3    　　　　In any event, BART can establish that accommodating Plaintiffs under FEHA would

4    have imposed an undue hardship (or undue burden), for the same reasons as under Title VII.

5    Indeed, the California statute that forbids employers from engaging in religious discrimination

6    expressly states that accommodation need not be extended if it would "endanger the employee's

7    health or safety or the health or safety of others."  Cal. Govt. Code § 12940(a)(1).  That

8    subsection was drafted to apply to discrimination with respect to physical or mental disability,

9    but the premise applies equally to religious accommodation.[17]  BART has submitted unrebutted

10   expert evidence that accommodating unvaccinated work by the Plaintiffs would have risked their

11   health, and the health of other employees and the public.  Lewnard Decl., ¶¶ 9-19; McClellan

12   Decl., ¶¶ 11-22.  As with Title VII, the driving concern was health and safety, not expense, and

13   those concerns provide more than adequate support to establish that BART would have faced an

14   undue hardship (or undue burden) had it accommodated Plaintiffs by permitting unvaccinated

15   work.  Plaintiffs are not entitled to summary judgment of their FEHA claims.  Fed. R. Civ. P.

16   56(a); *Celotex*, 477 U.S. at 324.

17   **IV.    Conclusion**

18   　　　　For the reasons set forth herein, and in the supporting declarations, Plaintiffs' Motion for

19   Partial Summary Judgment should be denied entirely.

20

21   　　　　Dated: February 16, 2024

22   　　　　　　　　　　　　　　　　　　GLYNN, FINLEY, MORTL,
     　　　　　　　　　　　　　　　　　　HANLON & FRIEDENBERG, LLP
     　　　　　　　　　　　　　　　　　　JAMES M. HANLON, JR.
23   　　　　　　　　　　　　　　　　　　VICTORIA R. NUETZEL
     　　　　　　　　　　　　　　　　　　DAWSON P. HONEY

24

25   　　　　　　　　　　　　　　　　　　By:____/s/ *James M. Hanlon, Jr.*_____
     　　　　　　　　　　　　　　　　　　Attorneys for Defendant San Francisco
26   　　　　　　　　　　　　　　　　　　Bay Area Rapid Transit District

27   _____

28   　　[17]  Quite likely, the California legislature did not fathom that accommodating an employee's
     religious belief could endanger the health or safety of the employee or others.